**BURGER KING OF ST. LOUIS, INC., a corporation, and Pagewood, Inc., a corporation, Plaintiffs-Respondents,**

v.

**Erwin WEISZ et al., Defendants-Appellants.**

No. 33389.

St. Louis Court of Appeals.

Missouri.

July 15, 1969.

Rehearing Denied Sept. 15, 1969.

———◆———

Frank P. Motherway, St. Louis, for defendants-appellants.

William H. Dahman, Tenney, Dahman & Mathewson, St. Louis, for plaintiffs-respondents.

WEIER, Commissioner.

Burger King of St. Louis, Inc. applied to the City of Overland for a permit to construct a building for use as a restaurant at the northwest corner of Page Avenue and Hurstgreen Drive in that city. After following the usual administrative procedures, the application was rejected by the Board of Adjustment. A petition for a writ of certiorari was filed in circuit court, and following a hearing, the court found the issues in favor of applicants and against the defendants, who were members of the Board of Adjustment, the Board of Aldermen and the City Engineer. The decisions of the Board of Aldermen and Board of Adjustment were reversed and the Boards were ordered to enter an order approving the permit.

The defendants-appellants narrow the issues by stating in their brief that the sole question on this appeal is the meaning of the terms "drive-in" and "drive-in establishment" as set out in the zoning ordinance of the City of Overland. With this statement, respondents, in their brief, agree. We will therefore confine our opinion and restrict our decision to this issue. (Benham v. McCoy, Mo., 213 S.W.2d 914, 917;

State ex rel. Gnekow v. United States Fidelity & Guaranty Co., Mo.App., 150 S. W.2d 581, 583; 5B C.J.S. Appeal and Error § 1801, p. 93.)

The City of Overland, by its Ordinance 560, provided a plan of use for various areas within its municipal boundaries. It was agreed in the pleadings that the location of the proposed Burger King building was zoned "D" Commercial District under Section 6 of this ordinance. This section prohibited the use of any land or building, or the erection of any building, within the district except for certain named uses. Among those permitted was: "Restaurant, tea room or cafe (excluding drive-in or curb service, dancing or entertainment)."

Overland contended that the proposed operation of the Burger King would be that of a restaurant with "drive-in" features that placed it under the exclusion clause of the ordinance. Burger King contended that it was a restaurant and not a "drive-in".

Plans for the proposed Burger King building called for a seating capacity of 70 people. The outside dimensions were 45 feet 4 inches by 50 feet 4 inches, providing a floor area of 2250 square feet. Off-street parking for 40 cars was proposed. The interior would be heated in the winter and air-conditioned in the summer.

In its plan of operation, there were to be no car-hops or waitresses and no take-out windows. A limited menu of prepared food would be offered its customers and it would be necessary for those who wished to purchase anything to go into the building where they would be served from a counter. Patrons could eat inside or take their order away from the building. There would be no service to automobiles, or curb-service, as it is frequently called. All food and beverages would be served in paper containers. An attendant would be available to seat people and to clean the premises.

With regard to the number of customers eating in the building and the number taking their purchases from the building for consumption elsewhere, it was estimated from experience in other like establishments that 80% would eat in the building and the rest take out their orders.

One of the aldermen stated that he had patronized another Burger King, and that out of seven or nine automobiles parked there, two or three were being used to eat in. He found that no knives or forks were provided and only a paper cup was used for coffee.

Considering the facts presented in the hearings before the Board of Aldermen and the Board of Adjustment, we find that the operation of the Burger King as described does not constitute it a "drive-in". It is true that its operation is not that of a full-service restaurant offering table service with all the amenities of linen, china and silver. It has no large and varied menu. Instead it has economized its operation by reducing personal service to a minimum. But this does not change its essential method and manner of operation so that it can be described as a "drive-in".

In arriving at our conclusion, we are mindful of one of the rules of construction and interpretation in determining the meaning of zoning ordinances. It is the same general rule applied to all legislative enactments. It requires that the court must ascertain the intent from the words used, if that is possible, and in so doing, give them their plain and ordinary meaning so as to promote the object and purpose of the enactment. The entire act must be considered, and the court should seek to avoid unjust, absurd, unreasonable, confiscatory or oppressive results. (Rosedale-Skinker Improvement Association v. Board of Adjustment of St. Louis, Mo., 425 S.W.2d 929, 933; Suburbia Gardens Nursery, Inc. v. St. Louis County, Mo., 377 S.W.2d 266, 271.)

By reference to Webster's Third New International Dictionary, p. 692, we find this definition: "drive-in: a place of business (as a motion-picture theater, bank, or refreshment stand) laid out and equipped

so as to allow its patrons to be served or accommodated while remaining in their automobiles."

In Fryer v. Board of Zoning Adjustment of Kansas City, 359 Mo. 559, 222 S.W. 2d 761, the court had to determine whether a "drive-in" serving root beer and ice cream came under the terms of an ordinance permitting the establishment of restaurants, moving picture shows, tea-rooms, parking stations or lots for passenger cars, gasoline and oil filling stations and other businesses of like character. The court held it was not a "restaurant" as ordinarily is understood by this word. But in finding that it was a business of like character to a filling station, parking lot, restaurant and other enterprises named, it made a significant factual summary of its mode of operation. The court said (l. c. 762): "The 'drive-in' which appellant seeks to operate would consist of a small building surrounded by parking space where customers would park and remain in their cars and would be served root beer and ice cream." The premises were planned and the business equipped to serve and accommodate patrons while they remained in their automobiles. (For a judicial definition of "drive-in" that follows Webster, supra, see State ex rel. Spiccia v. Abate, 6 Ohio App.2d 233, 217 N.E.2d 709, 710. For a judicial definition of a restaurant, see City of Flordell Hills v. Hardekopf, Mo.App., 271 S.W.2d 256, 258.)

In looking to the entire enactment, as we are admonished to do in Rosedale-Skinker and Suburbia Gardens Nursery, supra, we find that the Board of Aldermen of the City of Overland in another section of Ordinance 560 (Sec. 7, Item 16) has described a "drive-in" in like terms and with the same meaning: "Drive-in business, where persons are served in automobiles, such as a restaurant, refreshment stand, and the like."

A "drive-in" or "drive-in" business or establishment is a place or business where patrons may be served or accommodated while they remain in their automobiles. Burger King, in its essential plan of operation, is not a "drive-in". Customers will not be served while they remain in their automobiles.

The judgment of the circuit court is affirmed.

PER CURIAM:

The foregoing opinion by WEIER, C., is adopted as the opinion of this Court. Accordingly, judgment is affirmed.

WOLFE, P. J., and BRADY and DOWD, JJ., concur.