**STATE ex rel. C. C. G. MANAGEMENT CORP., Plaintiff-Appellant,**

v.

**CITY OF OVERLAND, et al., Defendants-Respondents.**

No. 41801.

Missouri Court of Appeals,
Eastern District,
Division Four.

Aug. 25, 1981.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 16, 1981.

Leonard Komen, Clayton, for plaintiff-appellant.

Norman Selner, David McMahon, Clayton, for defendants-respondents.

SIMON, Judge.

C.C.G. Management Corporation (C.C.G.), owner of the Burger King Restaurant at the corner of Page Avenue and Hurstgreen Drive in Overland, filed an application for a building permit to add a "drive-thru" window to its establishment. The Overland Building Commission and the Board of Aldermen denied the permit. C.C.G. duly filed its petition for review in the circuit court and the court affirmed the denial. C.C.G. appeals and asserts: (1) That its restaurant is not a conditional use nor a nonconforming use requiring a special permit, (2) it's proposed "drive-thru" operation is not a "drive-in" requiring a special permit, and (3) the Board's denial of the special permit was not supported by substantial evidence. We affirm.

C.C.G.'s restaurant building is of rectangular shape, 150 feet by 185 feet. The restaurant faces Page Avenue to the south and is bordered by Hurstgreen Drive on the

east and privately owned property on the west. The restaurant building itself is situated near the rear of the lot with parking spaces for patrons provided on either side of the lot and in two rows down the center. Patrons are served by parking their cars, entering the restaurant building, ordering food and consuming it on the premises or taking it off the premises in carry-out containers. In its present status, the restaurant is not a "drive-in" type facility. *Burger King of St. Louis, Inc. v. Weisz*, 444 S.W.2d 517, 518 (Mo.App.1969).[1]

The restaurant is located in a C–2 General Commercial District. The ordinance permits within this zone any of the uses permitted within the C–1 Neighborhood Commercial District. Section 4 Use Regulations A(7).[2] The C–1 district permissive uses include a "restaurant . . . not including drive-in or curb service . . . ." Section 4A(6)(k). Conditional Uses within the C–2 General Commercial District include a "drive-in establishment, including restaurant and theatre." Section 4A(7) Conditional Uses (a).

Under the foregoing provisions the Burger King, in its present status as a non drive-in type facility, is a permissive use not a nonconforming one.

Section 4(B)(5)(a) Special Uses Permits states, however, that:

"[I]n addition to the buildings or uses herein permitted notwithstanding, the following uses shall be permitted in the various districts only under the conditions hereinafter set out.

*In any districts the following*:

\*    \*    \*    \*    \*    \*

(a–11) Drive-in establishments and all restaurants.

\*    \*    \*    \*    \*    \*

Applications for permits shall be made to the Building Commissioner to investigate and report as to the effect of such building or use upon traffic and fire hazards, the character of the neighborhood and the general welfare of the community, or overtax the public utilities. Such report and recommendations shall be filed with the Board of Aldermen within 60 days after the date of reference to said Commissioner.

Upon receipt of the report and recommendation of the Building Commissioner, the Board of Aldermen may hold a public hearing in relation to the matter, giving notice of the time and place thereof, to be published at least two times in a newspaper printed or published in the City of Overland. If no newspaper be printed or published in the City, then in a newspaper of general circulation in the City of Overland. The first publication of said notice shall be at least fifteen (15) days prior to the date of such hearing.

*The Board shall determine whether such building or use will*:

(b–1) Substantially increase traffic hazards or congestion.

(b–2) Substantially increase fire hazards.

(b–3) Adversely affect the character of the neighborhood.

(b–4) Adversely affect the general welfare of the community.

(b–5) Overtax the public utilities.

If the Board finding be negative as to all the subjects referred to in (b–1), (b–2), (b–3), (b–4), and (b–5) above, then the application shall be granted; if affirmative as to any one of (b–1), (b–2), (b–3), (b–4), and (b–5) above, then such permit shall be denied."

Overland contends that § 4(B)(5)(a) Special Permits requires all restaurants, regardless of whether they are permissive or conditional uses, to secure special permits prior to obtaining a building permit and that because C.C.G. does not now have such a permit it is a nonconforming use as is defined by the ordinance. See § 4(A)(4).

█ C.C.G. does not claim to have a special permit but argues that the provision classifying its Burger King Restaurant as a

1. Burger King of St. Louis, Inc. is C.C.G.'s predecessor in interest.

2. All references are to the Zoning Regulations for the City of Overland, Missouri (January 1, 1976) unless otherwise specified.

permissive use within its district and the provision requiring "all restaurants" to have special permits are in conflict. C.C.G. would have our court resolve the alleged conflict by reading the section requiring all restaurants to have special permits "in conformity" with the section classifying restaurants which are not drive-ins as permissive use. Although C.C.G. does not elaborate on the meaning of "in conformity" we interpret that phrase to mean, for the purposes of C.C.G.'s argument, that were we to interpret the two provisions "in conformity" with each other, only drive-in restaurants would be required to have special permits. C.C.G. also urges us to apply the rule of ejusdem generis in resolving what it perceives as a latent ambiguity within the special permits provision. C.C.G. claims that application of that rule mandates a finding that the general term, "all restaurants," is limited in its scope of meaning by the preceding specific term "drive-in establishments." *See State ex rel. Rabenau v. Beckemeier*, 436 S.W.2d 52, 57 (Mo.App.1968).

We have no quarrel with C.C.G.'s proffered methods for resolving conflicts in zoning ordinances. They are, however, inapplicable to the ordinance provisions under consideration here. There is no conflict between the two provisions nor any ambiguity within the section requiring that special permits be obtained for certain uses. Although § 4(A)(7)(a) permits C.C.G.'s use within the C–2 district, § 4(B)(5)(a) mandates that C.C.G. must obtain a special permit pursuant to the procedure set forth in § 4(B)(5)(a). The special permit section does not conflict with the section specifying permissive uses, it merely imposes an additional requirement upon certain permissive uses.[3] The apparent intent of the Board of Aldermen in requiring that certain uses conform to an additional requirement, that

is, obtaining a special permit, is to provide a procedure by which the Board can exercise greater control over these uses. C.C.G. does not claim nor do we believe that the purpose behind the requirement or procedure for complying with it are in any way invalid.

▮▮ Furthermore there is no ambiguity within the special permit provision itself and therefore, we decline to apply the rule of ejusdem generis. That rule is merely a rule of construction and is only applicable where the legislative intent or the language expressing that intent is unclear. *See Mashak v. Poelker*, 367 S.W.2d 625, 630 (Mo. banc 1963); *State ex rel. Schneider's Credit Jewelers, Inc. v. Brackman*, 260 S.W.2d 800, 813 (Mo.App.1953). When the intent manifested by the statute's language is clear, rules of construction such as ejusdem generis should not be used to nullify the legislative intent. *United Air Lines, Inc. v. State Tax Comm'n*, 377 S.W.2d 444, 448 (Mo.banc 1964). *See State ex rel. Jewish Hospital of St. Louis v. Buder*, 540 S.W.2d 100, 108 (Mo.App.1976).

▮ Section 4(A)(5)(a)(a–11) states that "drive-in establishments and all restaurants" must apply for a special permit. Words used in statutes must, in the absence of a statutorily prescribed definition, be given their plain ordinary meaning. *See Bethel v. Sunlight Janitor Service*, 551 S.W.2d 616, 619 (Mo.banc 1977). "All" means every member or component of. Webster Third New 10 International Dictionary 54 (1961). "All restaurants" means, therefore, every member or component of the class of things called restaurants. C.C.G.'s restaurant is, without a doubt, a member of that class and is therefore required to have a special permit.[4] If the Board

---

3. The ordinance imposes this additional requirement upon permissive uses other than restaurants such as parking lots and garages which are permitted under the C–1 Neighborhood Commercial District and apartments or multiple dwellings which are permitted within the RA Residential District.

4. Compare this language with that contained in *State ex rel. Rabenau v. Beckemeier*, 436

S.W.2d 52 (Mo.App.1968), the case relied on by C.C.G. as support for the appreciation of the rule of ejusdem generis. In that case the zoning ordinance allowed the Board to grant a variance when the hardship resulting from enforcement of the ordinance was due to "(1) an irregularity in the shape of the lot; (2) its topography; or (3) some other conditions." *Id.*

intended to require only drive-in restaurants to have special permits it would have used language similar to that used to define conditional uses in the C–2 General Commercial District. Section 4(A)(7) Conditional Uses (a). In that section the Board specifies that a "drive-in establishment, including restaurant and theatre" are conditional uses. The language of § 4(A)(5)(a)(a–11) is clear as is the Board's intent and we will not construe the provision to defeat that intent.

■ It follows that because C.C.G. is required to have a special permit and does not have one, it has not complied with the regulations associated with the use as a restaurant. According to the ordinance, "a use which lawfully occupied a building or land at the time of the adoption of this chapter (as C.C.G. apparently did) and which does not conform with the use regulations of the district in which it is located" is a nonconforming use. Without the special use permit C.C.G. does not comply with the use regulations of its district and is, therefore, a nonconforming use. Structural alteration of nonconforming uses is prohibited by the ordinance unless required by "law or ordinance." C.C.G. does not deny that the addition to its building of a "drive-thru" window is a structural alteration and obviously it is not one required by law or ordinance. C.C.G. must, therefore, change its status as a nonconforming use by applying for a special permit before it can receive a permit to build a "drive-thru" window addition to its present facility.

C.C.G.'s second point, that the proposed "drive-thru" facility is not the same as the drive-in which requires a special permit is effectively disposed of by our previous discussion. Any future application for a special permit will, as a practical matter, encompass the proposed "drive-thru" structure. Furthermore as we have pointed out all restaurants were required to have special permits regardless of whether or not they are drive-in restaurants.

■ C.C.G. claims in its third point that there was no substantial evidence to support the Board of Aldermen's decision denying the permit. We disagree. Our review is limited to a determination of whether the Board's findings were reasonable in light of the evidence or whether the decision reached was contrary to the overwhelming weight of the evidence. We may not substitute our judgment for that of the Board's; we review the evidence in the light most favorable to its decision to determine whether such decision is supported by substantial and competent evidence. *Moore v. Board of Education of the Special School District of St. Louis County*, 547 S.W.2d 188, 191 (Mo.App.1977).

The Board based its denial of the permit on three of the five grounds to be considered prior to issuance of special permits as set out in Overland's zoning ordinances. *See* § 4(B)(5)(b), *supra.*

We shall briefly consider the evidence in support of each ground supporting the Board's decision, the first being a determination that the "drive-thru" facility would "substantially increase traffic hazards or congestion." Section 4(B)(5)(b)(b–1).

An examination of the plan for the "drive-thru" submitted by C.C.G. indicates that a number of parking spaces as well as room for maneuvering will be eliminated by the new structure. The traffic pattern established by the "drive-thru" facility would allow patrons to approach the "drive-thru" from either Page Avenue or Hurstgreen Drive, a residential street. All traffic would be funneled out of the lot in one direct only, onto Page Avenue west. A concrete median in the center of Page would prevent any of traffic from flowing east. Therefore all traffic would be funnelled out of the lot in one direction only onto Page Avenue west. As an off ramp of

---

at 57. In determining what the enactment board meant by "other conditions" the court properly applied the rule of ejusdem generis. Such application would not have been appropriate if, for example, the Board had provided

for variances for hardship due to all other conditions or every condition, for in that instance the Board's intent to grant variances to all applicants would have been clear. *Id.*

Highway 725, Page Avenue is very congested. C.C.G.'s representative testified that the "drive-thru" facility would result in an increase in traffic of 28%.

C.C.G. cites the case of *State ex rel. Steak n Shake, Inc. v. City of Richmond Heights*, 560 S.W.2d 373 (Mo.App.1977) to support its contention that the evidence in the instant case is not sufficient to support a finding that the proposed addition would substantially increase traffic hazards. In holding the City's denial of the applicant's petition arbitrary, capricious and an abuse of discretion the court stated:

"There was evidence that some increase in traffic would probably result from the proposed use, but there was absolutely no evidence that this increase in traffic would 'substantially increase traffic hazards or congestion.' This standard was not mentioned by any witness. There was no evidence of the existing volume of traffic, or of the capacity of the streets in the immediate neighborhood, or that the anticipated increase in traffic could not be absorbed by effective traffic controls."

Id. at 377.

Such is not the case here. Although no witness in the instant case used the express terms "substantial increase," the evidence regarding the existing volume of traffic on Page and Hurstgreen and the capacity of those streets when considered in conjunction with the plan of traffic flow submitted by C.C.G. was sufficient to support the Board's finding. It is not relevant that the evidence may have also supported a contrary finding. *Moore v. Board of Education of the Special School District of St. Louis County, supra* at 191.

C.C.G. also claims the Board's decision was arbitrary and capricious because it was based in part on personal knowledge and evidence not in the record.

Contrary to C.C.G.'s implications, there is nothing inherently wrong with the Board basing its decision on personal knowledge. The Board may utilize its personal observations in reaching the decision provided the facts which are known by the Board and upon which it bases its decision are disclosed on the record. *See, State ex rel. Steak n Shake v. City of Richmond Heights, supra* at 378. Here the minutes of the various meetings of the Board reflect that the Aldermen found the traffic conditions in the vicinity of the Burger King presently congested and additional traffic would increase traffic hazards. It was upon personal knowledge of these facts that their decision was based.

The Board based its opinion that the "drive-thru" would adversely affect the neighborhood on the evidence of substantially increased traffic congestion and protests from the immediate neighborhood's residents. In reaching their decision the Aldermen also observed the effect on the neighborhood of the probable increase in trash and noise. We believe there was substantial evidence to support the Board's finding that the proposed "drive-thru" facility would adversely affect the surrounding neighborhood.

There is no evidence, except as to the traffic, trash and noise, in the record which reflects how such an addition to the restaurant might affect the general welfare of the community. However, Overland's zoning ordinances mandate denial of a permit upon an affirmative finding on any one of the five considerations. Having found there was substantial evidence to support two of the five, the judgment is affirmed.

SATZ, P. J., and SMITH, J., concur.