**Paul BROTHERTON,**
**Plaintiff-Respondent,**

v.

**A. L. KISSINGER, Defendant-Appellant,**

and

**Bob Joyce, Bill Joyce and Nona Kissinger, Defendants.**

No. 10003.

Missouri Court of Appeals, Springfield District.

May 2, 1977.

R. Jack Garrett, Clyde A. Butts, Garrett & Butts, West Plains, for plaintiff-respondent.

Rich D. Moore, Moore & Brill, West Plains, for defendant-appellant.

Before STONE, P. J., and TITUS and FLANIGAN, JJ.

TITUS, Judge.

Count I of plaintiff's 4-count amended petition, prayed for dissolution of his alleged separate partnerships with defendants Joyce and defendant Kissinger, an accounting and judgment in a sum equal to his interests in the partnerships. Following a bench trial, where no opinion containing a statement of the grounds for the court's decision was asked or given (Rule 73.01–1(b), V.A.M.R.), the court rendered judgment completely exonerating defendants Joyce and declaring defendant Kissinger liable to plaintiff for $3,833, plus 6% interest thereon from August 17, 1970. After one unsuccessful attempt at appealing, defendant Kissinger has again appealed.[1]

In May 1968 the Joyces and plaintiff commenced a retail propane gas business at West Plains under the name of Crown Gas Company (hereinafter "old Crown"). Plaintiff's most unsatisfactory testimony regarding his association with the Joyces was that "We didn't have a contract or nothing," or we "never did have a clear cut agreement." Plaintiff's "understanding" about the matter, which ordinarily is not competent evidence [*Dill v. Poindexter Tile Company*, 451 S.W.2d 365, 372 (Mo.App.1970)], was "that if the business paid for itself or something like that," he would become a partner with a one-third interest in old Crown. In reality, the Joyces put up all the money, bought all the supplies and equipment, and plaintiff commenced selling and delivering gas for which he was paid $65 a week. Partnership income tax returns were filed for old Crown for 1968 and 1969 (final). These showed a percentage of partnership or beneficial interest of two-thirds in the Joyces and one-third in plaintiff. The undertaking lasted only until January 6, 1969, at which time, via various bills of sale, the Joyces without objection of plaintiff, sold all the assets of old Crown to defendant Kissinger. Plaintiff's name did not appear on the bills of sale as either seller or buyer. Old Crown suffered an operating loss in 1968 and at the end of that period plaintiff's capital account was reported to be "minus $295.85." Briefly and in passing, the only Joyce to testify referred to the venture as a "partnership agreement" with "a third interest for each one of us."

The final partnership return (1969) filed by old Crown reported the "Total Sale Price" to be $43,000. Kissinger asserted this was the actual sale and purchase price agreed to by him and the Joyces. Joyce conceded that in computing the $43,000 sale price, no reduction was made in the value of accounts receivable, in the price of propane tanks, vehicles, inventory, equipment or "anything." Documentary evidence (with the exception of only $503.71 in untraceable cash) evidenced that Kissinger paid $41,-848.59 in checks and cash directly to the

---

1. The judgment was also in favor of defendants Joyce on Kissinger's cross-claim against them. In Kissinger's appellant's brief he observes that "For the purpose of this appeal, we are concerned only with Count I" of plaintiff's petition. This manifests an abandonment of any complaint Kissinger could have asserted on appeal anent denial of his cross-claim. *Burger King of St. Louis, Inc. v. Weisz*, 444 S.W.2d 517[1] (Mo.App.1969). Ergo, we sustain Joyces' motion to dismiss the appeal as it may have affected them. However, plaintiff's motions to dismiss defendant's appeal are overruled.

Joyces. The balance of the $43,000 sale price, or $1,151.41, was paid by Kissinger by check to satisfy an outstanding account owed by old Crown. Plaintiff did not receive, either from the Joyces or from Kissinger, any of the money involved in the sale of old Crown.

Plaintiff and Joyce, in effect, agreed the $43,000 paid by Kissinger for old Crown represented a profit of $12,000 to $13,000 or a net of $4,000-plus to each of the three "partners." However, since plaintiff got no money, explaining what became of plaintiff's supposed profit posed somewhat of a problem. Predicated on Joyce's and plaintiff's additional asseveration that Kissinger said he would buy old Crown only if plaintiff continued in new Crown on the same basis he had shared with the Joyces, plaintiff and Joyce undertook to answer the question in the following fashions.

In his pretrial deposition, plaintiff testified that Kissinger actually paid only "something like" $38,000 of the agreed $43,000 total sale price because his (plaintiff's) $4,000-plus portion of the total profit was deducted from the $43,000 sale price so it could go into new Crown as his contributive share of a new partnership with Kissinger.[2] However, when it became obvious that Kissinger had indeed paid $43,000 in checks and cash, and resorting to the plea that "they had me so tangled up" when his deposition was taken, the gist of plaintiff's trial-testimony was that the $43,000 represented only the value of old Crown's assets and the Joyces' share of the profit, but did not include his individual share of the profits that was to be a credit to him on new Crown. In fine, plaintiff's attempted explanation suggests a total agreed-to selling price approximating $47,000. When reminded of his testimony that the total $43,000 sale price placed on old Crown did not include any discount of the assets, Joyce quixotically answered (in an effort to lend viability to plaintiff's claim to a share of

the profits) that plaintiff's "interest had already been figured out of it." Should this pronouncement somehow be credited with logic, it would amount to an agreement with plaintiff's trial-testimony that the total sale price agreed to between the Joyces and Kissinger was really about $47,000—not $43,000—and that the $4,000-plus not paid by Kissinger would somehow find its way into new Crown as an individual credit to plaintiff. Nevertheless, whatever amount of payment or credit it was that plaintiff claimed, that figure never found its way into the accounts or tax returns of either old Crown or new Crown; neither did the alleged payment or credit ever find a place in the individual tax returns filed by plaintiff.

As shown by old Crown's final return, Kissinger insisted the actual sale price of that concern was $43,000 and that there was no agreement plaintiff was to have a starting credit of any amount in new Crown. While acknowledging plaintiff was to work in the new business and denying that this was a condition attached to the purchase, Kissinger stated that "our agreement was that I would furnish the capital to operate the business, to buy the business, and [plaintiff] was to draw a drawing out of the business for his work in the business. . . . If and when the business ever paid for itself, then [plaintiff] would draw a third of the profits, and he would own a third of the business, and that was our agreement." The new business never paid for itself and 16 months after its purchase, Kissinger was casting about for a buyer "Because the business wasn't making a profit." Kissinger offered to sell new Crown to plaintiff for "just what I've got invested in it," but plaintiff declined because he had no money.

During new Crown's existence (January 6, 1969, to August 17, 1970), plaintiff was paid a weekly salary of $75 which was increased to $100 "for about the last month

2. Of course, $4000-plus would not equal anything like a contribution towards one-third interest in new Crown.

or so." To purchase old Crown and commence operating new Crown, Kissinger put up $26,500 of his own funds and $20,000 borrowed from the West Plains Bank, for which he pledged all the physical assets of new Crown as collateral. Sometime after this note was also signed by Kissinger et uxor, it was also signed by plaintiff and his wife. After paying $43,000 for old Crown and giving plaintiff a $500 "draw on future profits," $3,000 remained in new Crown's checking account for operating capital. Kissinger did not draw a salary from new Crown during its lifetime. Some attestation of the financial difficulties encountered by new Crown lies in the fact it borrowed from AMF Beaird, Inc., $1,050 in December 1969, and $2,491.50 in March 1970. The first note was signed "Crown Gas Company By A. L. Kissinger, Owner"; the second note was signed "Crown Gas Company By [plaintiff] Partner." Plaintiff made no cash contribution to new Crown at any time. Kissinger made a sale of new Crown to Ozark Gas Company on August 17, 1970, for $49,663. The bill of sale to Ozark and the depreciation schedule contained in new Crown's 1970 (final) partnership tax return, reveal that $10,057 in purchases of new equipment had been made by new Crown after it bought the business from old Crown in January 1969. This new equipment was contained in the sale to Ozark. The tax accountant who prepared the returns for both old and new Crown, stated that new Crown had experienced a 1969 operating loss of $2,780.88, a 1970 operating gain of $3,950.07, and a loss on the sale to Ozark in the sum of $1,672.87, making a net overall loss of $503.68. Plaintiff did not assume and did not pay any losses experienced by new Crown.

Upon receipt of $49,663 from Ozark, Kissinger paid the balance due on the promissory notes, supra, and discharged all obligations owed by new Crown to its outside creditors. Thereupon, Kissinger wrote a $26,000 check to himself which left new Crown with a bank balance of 47 cents. A further contribution by Kissinger to pay bank charges was necessary to close new Crown's bank account.

[1] The question at issue, as pleaded, tried and presented on appeal, is whether a partnership *in praesenti* existed between plaintiff and Kissinger which should be dissolved and an accounting ordered. The burden of proving the existence of the partnership rested with plaintiff and if he failed to satisfy this requirement he would not be entitled to the other relief sought. *Bates v. Morris,* 467 S.W.2d 286, 290[1] (Mo.App. 1971).

The Uniform Partnership Law defines partnership as "an association of two or more persons to carry on as co-owners a business for profit." § 358.060–1, V.A.M.S. Judicially, the term is defined as "'a contract of two or more competent persons to place their money, effects, labor and skill, or some or all of them, in lawful commerce or business and to divide the profits and bear the loss in certain proportions.' . . . The contract creating the partnership need not be written, but may be expressed orally or implied from the acts and conduct of the parties. . . . The primary consideration in determining the existence of a partnership is whether the parties intended to carry on as co-owners a business for profit." *Stuart v. Overland Medical Center,* 510 S.W.2d 494, 497[1–3] (Mo.App.1974).

Other general principles to bear in mind are that merely "helping out" in a business is not sufficient proof of a partnership; that receipt by a person of a share of the profits does not raise an inference of partnership if the profits were received in payment as wages (§ 358.070(4)(b), V.A.M. S.); that the purported partners must have made a definite and specific agreement proved by cogent, clear and convincing evidence, or at least by a preponderance of the credible evidence; that an agreement to share the profits and the losses may be implied, but the sharing of profits is not conclusive of the existence of a partnership unless there be a corresponding right of management in each partner. *Grissum v. Reesman,* 505 S.W.2d 81, 85–86 (Mo.1974). The fact a business files or doesn't file a partnership income tax return is not suffi-

cient alone to prove or disprove the existence of a partnership. *Grundel v. Bank of Craig,* 515 S.W.2d 177, 180 (Mo.App.1974); *Bates v. Morris, supra,* 467 S.W.2d at 290[6]. Unlike statutory and judicial definitions, the tax definition of "partnership" includes any pool, group, syndicate, joint adventure or other unincorporated organization by means of or through which any financial operation or business is carried on and which, for income tax purposes, is not a corporation, trust or estate. 1 Tax Coordinator, Tax Research Institute of America, Inc., ¶ B–1001, p. 14,051.

On this appeal we are not concerned with plaintiff's relationship to the Joyces during the existence of old Crown except as it may bear on his relationship with Kissinger. The best that can be said for plaintiff's equivocal testimony was that he had an "understanding" that at some time *in futuro* he would become a partner with the Joyces when "the business paid for itself or something like that," and that he would continue in new Crown with Kissinger under the same "understanding" or basis he had with the Joyces. In other words and in substance, plaintiff's "understanding" with both the Joyces and with Kissinger was that he would become a partner in either old Crown or new Crown upon the happening of some future contingency, i. e., when the business paid for itself. It is undisputed that neither operating business paid for itself or had produced net profits sufficient to reimburse either the Joyces or Kissinger for their capital contributions.

■ There is a vast difference between a partnership *in praesenti* and a partnership to be formed *in futuro.* Persons who agree to become partners at some future time or upon the happening of some future contingency have only an executory contract, and they do not become partners until the condition precedent is met. *Goodwin v. Win-*

ston, 241 Mo.App. 357, 363–365, 230 S.W.2d 793, 796–798[1–3] (1950); *Thompson v. Thompson,* 500 S.W.2d 203, 209[10] (Tex. Civ.App.1973); *Arnold v. Caprielian,* 437 S.W.2d 620, 625[3] (Tex.Civ.App.1969); *Willis v. Harvey,* 349 S.W.2d 323, 326[2] (Tex. Civ.App.1961); *Higgins v. Higgins,* 266 Ala. 514, 97 So.2d 812, 815 (1957); *Southard v. Oil Equipment Corporation,* 296 P.2d 780, 785[19] (Okl.1956); 68 C.J.S. Partnership § 11 a., pp. 418–419; 59 Am.Jur.2d, Partnership, § 29, at p. 953.

Not unlike the case at bar was *Cearley v. Cearley,* 331 S.W.2d 510, 512[1] (Tex.Civ. App.1960). In *Cearley* the agreement was that A would lease the store, buy all the necessary fixtures and equipment, and that when he recovered his costs, B would then become a partner and half owner of the business. The court there held the parties had only an executory contract to form a partnership *in futuro* and that B would not become a partner until A was paid in full for his expenditures. That contingency, as in the instant situation, never occurred and the formation of a partnership was never accomplished.

■ As once noted, the trial court gave no reason for the judgment rendered. Consequently, we do not know if the judgment was based, in part, upon a belief that a partnership *in praesenti* existed between plaintiff and Kissinger. Furthermore, if this was the case, we do not see how the court could have arrived at any sum of a money judgment without an accounting procedure which was not afforded by and cannot be gleaned from the superficial evidence produced at trial.[3] In any event, if the judgment was predicated on a finding of the existence of a partnership, the judgment was in error and was for the wrong party. Plaintiff suggests in his brief that the court's decision could be based on a finding of an individual obligation owed by

---

3. It is suggested the $3,833 judgment was calculated by subtracting from $4,333 the $500 "draw on future profits" given to plaintiff by Kissinger at the inception of new Crown. However, there was no factual foundation for concluding that plaintiff's interest in new Crown was, in fact, $4,333. Such a figure could be arrived at only by guess, speculation and conjecture and shielding plaintiff's alleged interest from participation in purchases, expenses and losses experienced by new Crown.

Kissinger to plaintiff irrespective of the existence of a partnership. But this was not the theory pleaded nor on which the case was tried, and for plaintiff now to raise an entirely new theory supporting affirmance of his own favorable judgment below is contrary to the established practice of appellate procedure. *Wantuck v. United Savings & Loan Ass'n,* 461 S.W.2d 692, 697[7] (Mo. banc 1971); *Huter v. Birk,* 439 S.W.2d 741, 745[9] (Mo.1969); *MFA Mutual Ins. Co. v. Southwest Baptist College, Inc.,* 381 S.W.2d 797, 802–803[6] (Mo.1964); *Stevens v. Missouri Pacific R. R. Co.,* 355 S.W.2d 122, 127[1] (Mo.1962); *Shelton v. M & A Electric Power Cooperative,* 451 S.W.2d 375, 380[8] (Mo.App.1970). Plaintiff's new theory is not before us and we decline to consider it sua sponte. Nevertheless, if the enigmatic $4,000-plus profit plaintiff allegedly realized from the sale of old Crown was ceded, arguendo, to be a reality, there is not one jot of evidence (except through an excessive stretch of a biased imagination) that Kissinger acknowledged its existence or agreed to its placement in new Crown as any benefit for plaintiff. At most under the proof, plaintiff's averred profit from the sale of old Crown and its alleged accommodation into the operations of new Crown was a unilateral declarative of plaintiff and the Joyces which perished from lack of mutuality or assent on the part of defendant Kissinger.

With caution and a firm belief that the judgment nisi was wrong, we hold the trial court's judgment was against the weight of the evidence and that there was no substantial evidence to support it. *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976). Being of that mind, the judgment is reversed.

All concur.