Craig J. **MORRISON**, International Home Cleaning, and Mighty Maids, Inc., Appellant,

v.

**LABOR AND INDUSTRIAL RELATIONS COMMIS- SION, Respondent.**

**No. WD 57877.**

Missouri Court of Appeals, Western District.

July 25, 2000.

---

Stephen E. Rothenberg, St. Louis, for appellant.

Sharon A. Willis, Kansas City, for Respondent.

Before VICTOR C. HOWARD, Presiding Judge, LAURA DENVIR STITH, Judge and JOSEPH M. ELLIS, Judge.

JOSEPH M. ELLIS, Judge.

Craig J. Morrison appeals the decision of the Labor and Industrial Relations Commission ("Commission") finding that Mighty Maids, Inc., International Home Cleaning, Inc., and Mr. Morrison were en-

gaged in a partnership and as such, were jointly and severally liable for unpaid unemployment contributions owed by Mighty Maids, Inc.

Prior to 1993, Mr. Morrison operated a nationally franchised residential cleaning service known as Merry Maids as a sole proprietor. On May 1, 1993, he formed a corporation, Mighty Maids, Inc., which engaged primarily in residential home cleaning services. Mr. Morrison was the sole shareholder and officer of the corporation. The corporation quickly became financially troubled and by 1995 was subjected to a federal tax lien for approximately $100,000. As a result, the Internal Revenue Service (IRS) seized the corporation's physical assets and later sold them at auction. At the same time, the IRS encouraged Mr. Morrison to set up another corporation to conduct business and requested that Mighty Maids, Inc. cease operations so there could be a final accounting of that entity's liabilities to the federal government. Accordingly, Mr. Morrison formed another corporation, International Home Cleaning, Inc. (IHC), in which he was again the sole shareholder and officer.[1] When the IRS sold the assets of Mighty Maids, Inc. at auction, IHC bought the Mighty Maids service mark, which is the company logo represented by a little mouse with a broom, for $300.

IHC engaged in the same business activities as did Mighty Maids, and, essentially, there was no interruption in the day-to-day operations after creation of the new corporation. It is unclear from the record whether Mighty Maids, Inc. (or IHC for that matter) continued to be in good standing as contemplated by § 351.076,[2] or whether proceedings for administrative dissolution pursuant to § 351.486 had ever been commenced by the Secretary of State. However, the record does reflect that Mr. Morrison did not proceed with

formal dissolution of Mighty Maids, Inc. by the board of directors and shareholders as authorized by § 351.464. The business was conducted from offices which were originally leased to Mr. Morrison, d/b/a Mighty Maids. The lease was entered into on ·February 6, 1995, and originally covered the period from November 1, 1994, through October 31, 1997. The lease was apparently extended for successive one-year terms. However, it was never transferred to Mighty Maids, Inc. or IHC because it was almost always in arrears and provisions of the lease precluded a transfer if an arrearage exists. Mr. Morrison personally guaranteed the terms of the lease.

The electric bills at the office were billed to Mr. Morrison. The business license to conduct business at this location was held in the name of Mighty Maids, Inc. The license was issued on February 17, 1998.

The office of the business enterprise included a minimum of office furniture, consisting primarily of an old computer and telephones. The business also owned some old vacuum cleaners that were used by its employees. While there were customer lists, including both current and old customers, it was unclear whether the lists were owned by Mighty Maids, Inc., IHC or Mr. Morrison. Moreover, their value was debatable. The old customers either did not want the service any longer or moved to a competing service. The current customer list was in constant flux and did not represent any on-going contractual commitment by either the business enterprise or the customer.

The services provided by the business enterprise were initially generated through customer inquiries and contact by telephone. In order to receive such calls, the business maintained 10 separate telephone numbers scattered throughout the St. Louis area. All of those numbers funneled into the office located in Shrewsbury, Mis-

---

1. From the record, it is unclear whether IHC or Mighty Maids, Inc., or either of them, was organized as a statutory close corporation pursuant to § 351.755 RSMo (1994).

2. All statutory references are to RSMo Cum. Supp. (1999) unless otherwise indicated.

souri. Eight of the ten numbers were billed to IHC. Of the remaining two, one was billed in the name of Craig Morrison, d/b/a Mighty Maids, and the other to Craig Morrison, d/b/a International Home Cleaning, Inc.

Based on appointments arising from telephone contacts, a two-person team was sent to the customer's residence to perform the cleaning services. These services usually took approximately 1–1/2 to 2 hours to complete. Customers were generally charged $60.00 per hour unless some other amount was negotiated between the customer and the business. No contract was executed to support the service or to provide any on-going commitment by either the business or the customer. Customers were expected to give the team, upon completion of their work, either a check, cash or credit card billing. The team then delivered the receipts collected to the office. Each team member was paid by a payroll service. Some were paid a straight hourly rate with no reimbursement for travel, while others were paid a lesser rate with travel reimbursement.

Payments received from customers in the form of checks or credit card bills were taken by Mr. Morrison to a check cashing service which converted the checks immediately to cash after a percentage deduction for the service. Mr. Morrison then used this cash to purchase money orders to pay such bills and expenses of the business, including those for office space, as could be covered by immediate revenues. Any excess, which apparently did not occur often, was deposited into one of the bank accounts held by each of the corporate entities. These accounts were for the most part by-passed because both accounts were frequently overdrawn.

The most significant expense of the business involved labor. Mr. Morrison estimated that 67 percent of each dollar went to pay employees. In order to pay this expense, Mr. Morrison would send a money order, showing the name Mighty Maids, to the payroll service which then issued checks to each employee, including Mr. Morrison.

In addition to the tax liens, the business owes other significant debts. Some of these debts were credit card debts incurred by Mr. Morrison, both before and after the incorporation of Mighty Maids, Inc. There also were significant debts owed to Mr. Morrison's mother and another individual who was courted as a potential investor. It is unclear from the record what individual or entity was responsible for repayment of the latter debts.

Mr. Morrison reported the wages he received from the corporations on his individual tax returns. The returns did not reflect any corporate dividends, or income or losses from partnerships or Subchapter S corporations. Mighty Maids, Inc. has not filed any tax returns since 1995 or 1996. IHC has never filed a tax return.

The Division of Employment Security (Division) began investigating Mr. Morrison, Mighty Maids, Inc., and IHC to determine who was responsible for unemployment contributions for workers. On December 31, 1998, a deputy of the Division found that Mr. Morrison, Mighty Maids, Inc., and IHC were conducting business as a partnership, that the partnership had acquired and continued without interruption substantially all of the business of Mighty Maids, Inc., and therefore Mr. Morrison and both corporations were jointly and severally liable for unemployment contributions owed to the Division pursuant to § 288.210. The parties were assessed for contributions due in 1996, 1997, and 1998.[3]

---

**3.** In accordance with § 288.160.5(1), absent fraud or misrepresentation by the employer, the Division cannot collect unpaid contributions more than three years overdue. Section

288.160.5(1), RSMo Cum.Supp. (1997) provides:

> In any case in which any contributions, interest or penalties imposed by law are not paid when due, the notice of the assessment

Mr. Morrison appealed this decision and, after a hearing on May 18, 1999, the Appeals Tribunal of the Division affirmed the deputy's determination. Mr. Morrison then applied to the Labor and Industrial Relations Commission (Commission) for review of the Appeals Tribunal's decision. The Commission affirmed the Appeals Tribunal and adopted its decision as that of the Commission. Mr. Morrison brings this appeal.

Appellate review of decisions of the Commission regarding employment security law is governed by § 288.210, which provides in pertinent part:

> The findings of the commission as to the facts, if supported by competent and substantial evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of the appellate court shall be confined to questions of law. The court, on appeal, may modify, reverse, remand for rehearing, or set aside the decision of the commission on the following grounds and no other:
>
> (1) That the commission acted without or in excess of its powers;
>
> (2) That the decision was procured by fraud;
>
> (3) That the facts found by the commission do not support the award; or
>
> (4) That there was no sufficient competent evidence in the record to warrant the making of the award.

§ 288.210.

While determinations of fact made by the Commission are conclusive and binding on the reviewing court if those facts are supported by substantial and competent evidence, *SportsTicker Enterprises v. Division of Employment Security.*, 961 S.W.2d 909, 911 (Mo.App. W.D. 1998), we are not bound by the Commissions' conclusions of law or its application

of law to the facts. *Landmark Industries of Illinois, Inc. v. Division of Employment Security*, 942 S.W.2d 446, 447 (Mo.App. W.D.1997). Where the facts are undisputed and the issue involves the application and construction of a law to virtually uncontroverted facts, the issue is one of law. *Division of Employment Security v. Taney County Dist. R–III*, 922 S.W.2d 391, 393 (Mo. banc 1996).

A two-step process must be employed to determine whether the findings made by the Commission are supported by competent and substantial evidence. *Id.* That two-step process was set forth by this court in *Davis v. Research Medical Center*, 903 S.W.2d 557 (Mo.App. W.D.1995) and was later found applicable to employment security decisions in *Travelers Equities Sales, Inc. v. Division of Employment Security*, 927 S.W.2d 912, 917 (Mo.App. W.D. 1996). In *Davis*, we stated:

> The reviewing court may not substitute its judgment on the evidence for that of the Commission. The weight of the evidence and the credibility of witnesses are ultimately for the Commission. The court applies a two-step process designed to determine whether the Commission could have reasonably made its findings and award upon consideration of all the evidence before it. In the first step, the court examines the whole record, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award, to determine if the record contains sufficient competent and substantial evidence to support the award. If not, the Commission's award must be reversed. If there is competent and substantial evidence supporting the award, the court moves to the second step, where it views the evidence in the light most favorable to the award, but must consider all evi-

---

of such contributions, interest and penalties shall be served upon or mailed to the employer within three years of the date upon which the payment of the contributions was due except that in any case of fraud or

misrepresentation on the part of the employer, the notice of the assessment of the contributions, interest and penalties may be served upon or mailed to the employer at any time.

dence in the record, including that which opposes or is unfavorable to the award, take account of the overall effect of all of the evidence, and determine whether the award is against the overwhelming weight of the evidence.

*Davis,* 903 S.W.2d at 571.

█ In his sole point on appeal, Mr. Morrison contends the Commission erred in finding that he was a partner in the operation of Mighty Maids, Inc., thereby making him jointly and severally liable for the debts of the corporation. Mr. Morrison sets forth two arguments to support his contention that the Commission erred in making its determination. First, he claims that a partnership was not formed between himself, Mighty Maids, Inc., and IHC because the parties did not *intend* to create a partnership. Secondly, he argues the three parties involved did not *acquire* substantially all of the business of Mighty Maids, Inc. within the meaning of § 288.110, RSMo (1994).

Section 288.110, RSMo (1994) generally provides that if an individual or entity acquires substantially all of the business of an employer and, after the acquisition, the employer's business is continued without interruption solely by the successor, then the acquiring entity shall stand in the position of the predecessor employer in all respects, including being liable for current or delinquent unemployment contributions, interest and penalties.[4] The Commission found that Mr. Morrison, Mighty Maids, Inc., and IHC formed an unnamed partnership; that this partnership acquired substantially all of the business of Mighty Maids, Inc., presumably in 1995 when its physical assets were seized by the IRS; and that the business of Mighty Maids, Inc. was continued without interruption solely by this unnamed partnership after the acquisition.

The key to resolution of this appeal is a determination of whether Mr. Morrison, Mighty Maids, Inc., and IHC were partners. Our courts have defined a partnership as " 'a contract of two or more competent persons to place their money, effects, labor and skill, or some or all of them, in lawful commerce or business and to divide the profits and bear the loss in certain proportions.' " *Meyer v. Lofgren,* 949 S.W.2d 80, 82 (Mo.App. W.D.1997)(*quoting Stuart v. Overland Medical Center,* 510 S.W.2d 494, 497 (Mo.App.1974)).

█ The burden of proving a partnership is on the party asserting the existence of the partnership. The law never presumes that a partnership exists, but rather the burden is upon the party asserting its

4. The pertinent statutory language is as follows:

Any individual, type of organization or employing unit which has acquired substantially all of the business of an employer, excepting in any such case any assets retained by such employer incident to the liquidation of his obligation, and in respect to which the division finds that immediately after such change such business of the predecessor employer is continued without interruption solely by the successor, shall stand in the position of such predecessor employer in all respects, including the predecessor's separate account, actual contribution and benefit experience, annual payrolls, and liability for current or delinquent contributions, interest and penalties. If two or more individuals, organizations, or employing units acquired at approximately the same time substantially all of the business of an employer (excepting in any such case any assets retained by such employer incident to the liquidation of his obligations) and in respect to which the division finds that immediately after such change all portions of such business of the predecessor are continued without interruption solely by such successors, each such individual, organization, or employing unit shall stand in the position of such predecessor with respect to the proportionate share of the predecessor's separate account, actual contribution and benefit experience and annual payroll as determined by the portion of the predecessor's taxable payroll applicable to the portion of the business acquired, and each such individual, or organization or employing unit shall be liable for current or delinquent contributions, interest and penalties of the predecessor in the same relative proportion.

§ 288.110, RSMo (1994).

existence to establish all elements of a partnership by clear, cogent and convincing evidence. *Nesler v. Reed*, 703 S.W.2d 520, 523 (Mo.App. E.D.1985). This burden is met if evidence is presented which establishes " 'a contract of two or more competent persons to place their money, effects, labor and skill, or some or all of them, in lawful commerce or business and to divide the profits and bear the loss in certain proportions.' " *Id.* (*quoting Kielhafner v. Kielhafner*, 639 S.W.2d 288, 289 (Mo.App.1982)).

A partnership agreement can be in written form, expressed orally, or implied from the acts and conduct of the parties. *Meyer*, 949 S.W.2d at 82. In the absence of a written contract creating a partnership, a partnership can be implied only if "the purported partners...have made a *definite and specific agreement* proved by cogent, clear and convincing evidence, or at least by a preponderance of the credible evidence[.]" *Shea v. Helling*, 826 S.W.2d 419, 421 (Mo.App. E.D.1992) (*quoting Brotherton v. Kissinger*, 550 S.W.2d 904, 907 (Mo.App.1977)(emphasis added); *Wirth v. Wirth*, 646 S.W.2d 394, 396 (Mo.App. S.D.1983). The intent of the parties is the primary criterion for determining whether a partnership relationship exists. *Meyer*, 949 S.W.2d at 82. The requisite intent is satisfied by an intent to enter a relationship which in law constitutes a partnership rather than an intent to form a partnership. *Id.; Fischer v. Brancato*, 937 S.W.2d 379, 382 (Mo.App. E.D.1996); *Arnold v. Erkmann*, 934 S.W.2d 621, 630 (Mo.App. E.D.1996); *Schreibman v. Zanetti*, 909 S.W.2d 692, 701 (Mo.App. W.D.1995). This intent is determined at the time of formation. *Fischer*, 937 S.W.2d at 383.

In addition to the foregoing, the Uniform Partnership Law as adopted in Missouri, § 358.010 *et seq.*, provides further guidance. Section 358.060.1 provides that "[a] 'partnership' is an association of two or more persons to carry on as co-owners a business for profit and includes, for all purposes of the laws of this state, a registered limited liability partnership." The Law also specifies rules for determining the existence of a partnership.

In determining whether a partnership exists, these rules shall apply:

(1) Except as provided by section 358.160 persons who are not partners as to each other are not partners as to third persons;

(2) Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of the property;

(3) The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived;

(4) The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment:

(a) As a debt by installments or otherwise;

(b) As wages of an employee or rent to a landlord;

(c) As an annuity to a widow or representative of a deceased partner;

(d) As interest on a loan, though the amount of payment vary with the profits of the business;

(e) As the consideration for the sale of a goodwill of a business or other property by installments or otherwise.

*§ 358.070*, RSMo (1994).

The Commission concluded that the means for conducting the business, as well

as the manner in which it was conducted, established the existence of a partnership. The Commission adopted the decision of the Appeals Tribunal, which stated in reaching this conclusion:

[Mr. Morrison] is in the unique position as the sole stock holder and officer of two corporations to be able to self deal with no accountability. He needs no formal agreements between entities to protect the interest of each individual entity because he is the alter ego of both. In taking various actions involving the business, it is impossible to tell whether Mr. Morrison is acting on behalf of any particular corporation or on his own behalf because of these unique circumstances. This state of affairs is orchestrated by Mr. Morrison's failure to pay a modicum of attention to conducting the business within the corporate structures he has created. In creating this muddled situation, Mr. Morrison is now in the position of reaping what he has sown.

While we agree with the Commission that Mr. Morrison did not conduct the affairs of the corporations in the manner contemplated by our corporation laws or as customarily handled in the business world, there is nevertheless no basis to find that a partnership existed based on the virtually uncontroverted factual record.

▌ We observe first that there was no evidence of a written or oral partnership agreement. Therefore, the only way a partnership can be established is by implication and this can only be done where there is clear, cogent and convincing evidence that "the purported partners ... have made a *definite and specific agreement ...*" *Shea*, 826 S.W.2d at 421 (*quoting Brotherton*, 550 S.W.2d at 907)(emphasis added). The clear, cogent and convincing standard is met only when the evidence instantly tilts the scales in favor of the affirmative when weighed against the evidence in opposition and the fact finder is thereby left with the abiding conviction that the evidence is true. *In the Interest*

*of A.H.*, 9 S.W.3d 56, 59 (Mo.App. W.D. 2000). The evidence is simply insufficient, if any exists at all, to satisfy this standard of proof in showing a definitive and specific partnership agreement by and among Mr. Morrison and the two corporate entities.

▌ "Indicia of a partnership relationship includes a right to a voice in management of the partnership business, a share of the profits of the partnership business, and a corresponding risk of loss and liability to partnership creditors." *Arnold*, 934 S.W.2d at 630. While Mr. Morrison did have an active role in operating and managing Mighty Maids, Inc. and IHC, there is no proof that Mr. Morrison intended to or did in fact share in the profits, or agree to accept the losses and liabilities generated by either corporation. In fact, the record would suggest otherwise. His role in the business is more consistent with being the sole officer and manager of the corporations' business than being a partner with the corporate entities. The money Mr. Morrison received from the corporations was in the form of a paycheck, just as team members who cleaned homes received. He reported that income as salary and wages on his personal income tax returns. He did not include any corporate dividends on his returns, and more importantly did not take advantage of the losses incurred by the business by reporting them as partnership losses on his personal return. The payment of wages, even if from the profits of the business, is not *prima facie* evidence that a partnership exists. § 358.070(4)(b), RSMo (1994); *Nesler*, 703 S.W.2d at 525.

The evidence is likewise insufficient to justify the finding of a partnership by the very definition of the term. As noted previously, § 358.060.1 defines a partnership as "*an association of two or more persons to carry on as co-owners a business for profit.*" There is really nothing in the record to support any finding of co-ownership by Mr. Morrison and the corporate entities. At best, it appears the business

was conducted out of premises leased to Mr. Morrison in his name alone, and that two of the business' ten telephone lines were billed to Mr. Morrison, doing business as Mighty Maids on one and doing business as IHC on the other. IHC owned the Mighty Maids service mark and eight of the ten telephone lines were billed directly to IHC: Mr. Morrison had no interest in them. The business owned the vacuum cleaners used by the teams and presumably the customer lists. Mr. Morrison had no interest in them. The corporate entities had bank accounts in their respective names which were not co-owned by Mr. Morrison. The use of common property does not of itself establish a partnership. § 358.070(2). These facts certainly do not establish co-ownership of a business for profit and are in fact more consistent with a sole shareholder and officer of a corporation commingling personal and corporate affairs. And, as noted, we are unable to discern any evidence demonstrating an intent to "divide the profits and bear the loss in certain proportions." Meyer, 949 S.W.2d at 82.

In the absence of clear, cogent and convincing evidence of a definite and specific agreement to operate as a partnership, or any proof of an intent to enter a relationship which in law constitutes a partnership, we cannot find that Mr. Morrison, Mighty Maids, Inc., and IHC are members of a partnership.

The fundamental question presented in this case was succinctly stated by the Appeals Tribunal in its decision, which was later adopted by the Commission: "Although the legal issue in this matter is framed within the context of Section 288.110, RSMo, the real issue is whether the appellant, Craig Morrison, can be assessed personally for the unpaid contributions of Mighty Maids, Inc." We appreciate the Division's frustration at being unable

5. The Commission does not assert that Mr. Morrison's overall control of the corporate entities permits him to be held liable on a theory of piercing the corporate veil. See, generally, 66, Inc. v. Crestwood Commons Re-

to collect the unpaid unemployment security contributions owed for the workers at Mighty Maids, Inc. and IHC. However, we cannot condone the finding of a partnership where the uncontroverted facts do not establish the legal elements of a partnership. And, we can only decide the issue presented to us by this appeal and that is whether Mr. Morrison, Mighty Maids, Inc., and IHC were members of a partnership.[5]

Accordingly, the decision of the Labor and Industrial Relations Commission is reversed.

All concur.

development Corp., 998 S.W.2d 32, 40 (Mo. banc 1999) and Saidawi v. Giovanni's Little Place, Inc., 987 S.W.2d 501, 504–05 (Mo.App. E.D.1999).