**H2O'C LTD and John T. O'Connor, Appellants,**

v.

**Blaise BRAZOS, Respondent.**

**Nos. WD 61756, WD 61834.**

Missouri Court of Appeals, Western District.

Aug. 12, 2003.

Rehearing Denied Sept. 30, 2003.

Thomas M. Schneider, Columbia, for appellant.

David W. Walker, Columbia, for respondent.

Before ELLIS, C.J., LOWENSTEIN and HOLLIGER, JJ.

HAROLD L. LOWENSTEIN, Judge.

John T. O'Connor and H2O'C, Ltd. (collectively Appellants) appeal from the trial court's judgment in favor of Blaise Brazos on Count I through IV of Brazos' Counterclaim against Appellants.[1] The respondent's counterclaim prayed for and the trial court declared the existence of a partnership between the parties.

### OVERVIEW OF THE CASE

A brief overview and explanation of the underlying case, and the procedural snarl generated in getting to this point of the appeal is in order. Suffice it to say that deciding a fairly simple question has devolved into a lengthy quagmire and will necessarily require extended discussion. At the heart of this lawsuit is this issue: Did an ongoing and extended business relationship between two scientists who together preformed consulting work on

---

1. The trial court found in favor of Appellants with respect to Count V, since that claim was abandoned at trial.

wastewater treatment projects, without benefit of any written agreement, adequately support a judgment declaring a partnership? The actual period of the business relationship (1993–97) lasted less time than it has taken to attempt to determine ownership of limited personal property and division of expenses and profits (suit was filed in March 1997 by one party to replevin assets, a counterclaim filed by the other to declare a partnership existed, wrangling over pre-trial and discovery motions, numerous continuances, a dismissal for failure to prosecute, and several prior appeals which suffered from finality problems, the case was finally argued here over five years later.)

John O'Connor and the corporation H2O'C of which he and his wife are the sole shareholders instituted suit in 1997 to replevin a microscope and other personal property with a total value of $7,061 plus business documents from Blaise Brazos who was described as "formerly an employee and later an independent contractor" of the plaintiffs. In 1999 Brazos filed this five count counterclaim against the plaintiffs which included a claim that the relationship between the parties, ". . . was and is a partnership in fact" under the Uniform Partnership Act adopted in Missouri.

## FACTUAL AND PROCEDURAL HISTORY

O'Connor and Brazos began their association in the late 1970's or early 1980's when Brazos worked in O'Connor's lab at the University of Missouri–Columbia. O'Connor was then chairman of the department of engineering. Over the next several years, O'Connor employed Brazos to work on externally funded research projects at the university on an as-needed basis. In 1993, O'Connor and Brazos began conducting drinking water analysis for profit. In an initial project, O'Connor and Brazos were paid directly and individually. In October of 1993, O'Connor incorporated H2O'C Ltd. as a Missouri corporation with himself and his wife as the only shareholders. The corporation was formed by O'Connor to handle the money received from the consulting projects and for tax purposes. Until their business relationship ended in March 1997, O'Connor and Brazos provided consulting services on several projects, including a five-year project with Premium Standard Farms that Brazos brought in as a client to H2O'C.

O'Connor was primarily responsible for preparing the project budget with some input from Brazos, negotiating the contract, and preparing reports once the projects began. Brazos did the lab and fieldwork and provided assistance on the reports and papers that were written. During this time, no partnership agreement was signed and no partnership tax returns were filed. During their association, both Brazos and O'Connor were consulting and receiving compensation on projects that were not apart of H2O'C. From 1993 through 1996, Brazos filed his individual income tax returns listing his occupation as a sole proprietor consultant.

At trial, Brazos testified that he and O'Connor had agreed to split the revenues equally. He also said "He told me I was a partner; he allowed me to act like a partner; he encouraged me to act like a partner. I'm a partner." Further, he presented at trial the testimony of two individuals who stated that the relationship was characterized as a partnership. The first was an associate professor at the University of Missouri–Columbia who testified that at a surplus auction, which he attended as well as O'Connor and Brazos, he believed that O'Connor used the word "partner" in referring to his association with Brazos. The second individual, another professor from the university and

the one responsible for sending the Premium Standard Farms project to Brazos, testified that he heard O'Connor state. that there was a partnership between O'Connor and Brazos. Brazos also presented evidence of a "Superior Technology Demonstration—Evaluation of Alternative Treatment Technologies" report, which provided short biographies for O'Connor and Brazos and stated that "[t]ogether, they constitute H2O'C." In addition, Brazos offered a letter written by O'Connor in which O'Connor said he was worried about Brazos purchasing a $40,000 microscope. In the letter, O'Connor stated "I've been fretting about your microscope dilemma all night. So, I thought I would write as both friend and business partner to share my thoughts." Brazos ultimately purchased the microscope with his own funds. Brazos' business cards identified him as a "Drinking Water Microbiologist." And, a paper published in *Public Works Magazine,* identified O'Connor as the principal of H2O'C and Brazos as a drinking water microbiologist with H2O'C.

The relationship between Brazos and O'Connor began deteriorating about the time O'Connor brought his son into the business. At that point, Brazos stated that his amount of compensation, specifically from the Premium Standard Farms project, was being reduced from that which they had agreed. Brazos testified that in July before the end of their association he confronted O'Connor and asked, "Are we in a partnership or not?" He stated that he felt like O'Connor's son had "veto power over" him. Again in January 1997, they had another conversation in which Brazos asked O'Connor, "What is our business arrangement?" After consulting with his brother, who is a CPA, Brazos began trying "to separate along financial lines." When the separation was complete, Brazos filed for unemployment.[2] The Division of Employment Security determined that he was not. qualified for benefits because he left work voluntarily without good cause attributable to the work or the employer.

Following the end of their business relationship in March 1997, Appellants filed a petition (later amended) in replevin requesting the return of certain items in Brazos' possession. In January 1998, Brazos filed his Answer to the First Amended Petition.[3] On January 13, 1998, the trial court entered an order in which it found that Appellants were entitled to the right of possession of the items, evidently those that were the subject of Appellant's petition. This order is not contained in the record, only a transcript of the hearing.

Brazos then filed a First Amended Answer and Counterclaim requesting a determination of a partnership and distribution of assets. Specifically, Count I requested that the court determine that a partnership existed. Count II requested an accounting of the partnership, if one was found. Count III sought damages relating to the storage of O'Connor's personal belongings, one-half of the gross revenues, and one-half the value of the partnership property. Count IV requested damages for the conversion of personal property. Count V alleged misrepresentation and sought damages for the loss of opportunity to participate in profits. During this time, Appellants also filed a Supplemental Peti-

---

**2.** It is unclear from the record exactly when Brazos filed for unemployment benefits. The Division's denial was dated March 1997.

**3.** While the docket entry does not designate this as an Answer and a Counterclaim, this court can only assume that the allegations of the later Counterclaim (which serves as the basis for the judgment) were originally asserted in this document.

tion, claiming that if a partnership existed, Brazos received a greatly disproportionate distribution and that Appellants were entitled to recover the disproportionate profits received.[4]

After numerous continuances and the case being placed on the dismissal docket for failure to prosecute, a bench trial was held on May 1–2, 2001. The trial court issued findings of fact, conclusions of law and judgment. Appellants filed a notice of appeal in June 2001. In November 2001, this court issued its mandate dismissing the appeal for lack of jurisdiction. The trial court had not entered judgment with respect to Count V. In March 2002, Brazos filed a motion to amend and modify findings of fact, conclusions of law and judgment. Appellants also filed a motion to amend and vacate judgment and motion for a new trial. The trial court took up the motions of April 22, 2002, and again issued findings of fact, conclusions of law and amended judgment. Appellants once again filed a notice of appeal, but this court dismissed the appeal yet again for lack of jurisdiction since the judgment had not been filed. On July 25, 2002, the judgment was filed. In that judgment, the trial court found that a partnership did exist and that O'Connor and Brazos had agreed to split gross profits "50–50." The court's judgment in favor of Brazos on Counts I through IV, awarded damages in the amount of $55,036.81 plus interest representing Brazos partnership interest and $300.00 in damages for conversion of his personal property. The trial court entered judgment in favor of Appellants on Count V, loss of business opportunity, having concluded that this claim was abandoned at trial. This third appeal is addressed.

## JURISDICTION

■ Before this court turns to the merits of the appeal, it must once again determine whether jurisdiction is proper. *Lumbermens Mutual Casualty v. Thornton*, 36 S.W.3d 398, (Mo.App.2000). While neither party raises the issue of jurisdiction, this court must do so *sua sponte*. *Id.* A judgment is final, and thus appealable, if it " 'resolves all issues in a case, leaving nothing for future determination.' " *Id.* (quoting *Gibson v. Brewer*, 952 S.W.2d 239, 244 (Mo. banc 1997)). If there is no final judgment, this court has no jurisdiction to entertain the appeal and the appeal must be dismissed. *Id.*

The judgment here is based on deciding the claims raised in the Brazos' counterclaim, which requested declaration of a partnership, an accounting, valuation of partnership assets, etc. There are two items that could raise the matter of finality for failing to resolve all issues presented and leaving matters for future determination: (1) In the amended judgment entry in which Brazos prevailed, the court stated that an accounting was ordered "to such an extent that said accounting has not already been completed . . ."; and, (2) The court did not address the issue of specific partnership property. Suffice it to say this case has been somewhat unusual. In cases where an accounting of partnership assets has been requested, the normal procedure is for a bifurcated trial. *Fleahman v. Fleahman*, 25 S.W.3d 162, 163 (Mo.App. 1999). The first stage is to determine, via an interlocutory order, if there is a right to

---

**4.** It does not appear that this petition was decided by the court. The final judgment with respect to the counterclaim effectively disposed of the issues in this petition. Having found that Brazos was entitled to an award based upon the division of gross profits, pre- cluded a finding that Brazos received a disproportionate amount. Thus, the failure to decide this issue does not affect the finality of judgment. *See State ex. rel Igoe v. Bradford*, 611 S.W.2d 343, 351 (Mo.App.1980).

an accounting, and if so then the second stage is to try the actual accounting. In *Fleahman,* the formal accounting had not been held and there was no judgment dividing the partnership assets. *Id.* at 164. Here, the court proceeded to determine the existence of a partnership, and then with the apparent consent of the parties went on to conduct an accounting. Since the court here holds a partnership was never created, rendering moot the rulings on assets and profits, there is no need to further prolong this suit by ordering a remand.

### STANDARD OF REVIEW

This court's review of a case tried without a jury is governed by the principles of *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976). This court will affirm the judgment of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* at 32; *Fischer v. Brancato,* 937 S.W.2d 379, 380 (Mo.App.1996). An appellate court "reviews the evidence in the light most favorable to the prevailing party, giving it the benefit of all reasonable inferences and disregarding the other party's evidence except as it supports the judgment." *Meyer v. Lofgren,* 949 S.W.2d 80, 82 (Mo.App.1997). This court defers to the trial court in determining the credibility of witnesses. *See id.*

### ARGUMENT

■ In their first point on appeal, Appellants assert that the trial court erred in finding that a partnership existed. They say that Brazos failed to prove the existence of a partnership by clear, convincing and cogent evidence.

In *Meyer v. Lofgren,* 949 S.W.2d 80 (Mo.App.1997), this court addressed the statutory and judicial definitions of partnership:

> A partnership is statutorily defined as "an association of two or more persons to carry on as co-owners a business for profit." § 358.060.1.... A partnership has been judicially defined as a contract of two or more competent persons to place their money, effects, labor and skill, or some or all of them, in lawful commerce or business and to divide the profits and bear the loss in certain proportions. The partnership agreement need not be written but may be expressed orally or implied from the acts and conduct of the parties ..., with the intent of the parties serving as the primary criterion for determining whether such a relationship exists.

*Id.* (internal quotations and citations omitted). The intent necessary to find a partnership is not the intent to form a partnership, but the intent to enter a relationship that legally constitutes a partnership. *Id.* The law does not presume the existence of a partnership, and Brazos, as the party seeking to establish the existence of a partnership, has the burden to prove its existence by clear, cogent and convincing evidence. *Nesler v. Reed,* 703 S.W.2d 520, 523 (Mo.App.1985). The Supreme Court of Missouri has discussed this standard in *Grissum v. Reesman,* 505 S.W.2d 81, 86 (Mo. banc 1974).

> As we now construe the phrase, it really means that the court should be clearly convinced of the affirmative of the proposition to be proved. This does not mean that there may not be contrary evidence. The word 'cogent' adds little, if anything; it means impelling, appealing to one's reason, or convincing.

"Indicia of a partnership relationship includes a right to a voice in management of

the partnership business, a share of the profits of the partnership business, and a corresponding *risk of loss* and liability to partnership creditors." *Morrison v. Labor and Indus. Relations Com'n,* 23 S.W.3d 902, 909 (Mo.App.2000) (emphasis added).

Since there is no written partnership agreement in this case, the agreement or existence of a partnership, or lack thereof, may be implied by the conduct of the parties. *Grissum v. Reesman,* 505 S.W.2d 81, 86 (Mo. banc 1974). The conduct of the parties does not support a finding that a partnership existed. O'Connor and Brazos' first association came when Brazos worked in O'Connor's lab on externally funded research projects. Brazos would do the work and be compensated through the research funds. This relationship changed when O'Connor left the university and the projects on which he and Brazos worked involved consulting projects. Brazos argues that during this time, they became partners.

Neither Brazos' nor O'Connor's actions were consistent with the establishment of a partnership. In his counterclaim, Brazos alleges that he and O'Connor formed a partnership and that the establishment of H2O'C "in no way affected the partnership relationship." In fact, he testified that he considered himself one partner and H2O'C or the O'Connor family the other partner. H2O'C was incorporated just after Brazos alleges that the partnership began. Yet, H2O'C was the primary entity that handled all aspects of the consulting services. For example, all of the contracts for the projects named H2O'C, and not Brazos and O'Connor individually or as partners, as a party; the payments resulting from the contracts were paid to H2O'C; Brazos received compensation through H2O'C; he had no interest in H2O'C; and all advertisements and papers were completed in the name of H2O'C. No evidence suggests that a partnership existed separate from H2O'C.

■ Brazos claims, as evidence of a partnership, that he and O'Connor split the gross profits equally, and each bore his own expenses. While the decision to divide profits may be prima facie evidence of a partnership, assuming there was a division of the profits, "the sharing of profits 'is far from conclusive, and this is particularly true where the parties, although agreeing to divide profits, do not agree to share any possible losses.'" *Nesler,* 703 S.W.2d at 525. In *Van Hoose v. Smith,* 355 Mo. 799, 198 S.W.2d 23, 27 (1947), the Supreme Court noted that "it is not sufficient to create a partnership that the parties were to share the profits of a given enterprise or transaction. They must also have agreed, that is, intended to share the losses and to become partners." Although a specific agreement to share losses may, in some instances, be implied, *Heald v. Erganian,* 377 S.W.2d 431, 439 (Mo.1964), the implication or presumption may be overcome by evidence to the contrary, *Troy Grain & Fuel Co. v. Rolston,* 227 S.W.2d 66, 68 (Mo.App.1950). Here, the presumption of an agreement to share in the losses is rebutted by Brazos' testimony—there is utterly no evidence that O'Connor and Brazos agreed or intended to share in any loss. Brazos testified that he did not intend to match any losses and that O'Connor "never agreed to match any losses" that he incurred. While Brazos may claim that no losses occurred during the business that would require him to contribute, the fact that there was no agreement or intention to share in the losses is evidence of the nonexistence of a partnership relationship. *See Van Hoose,* 198 S.W.2d at 27. It is unreasonable to assume that O'Connor agreed to share equally with Brazos the gross *revenues* (as

opposed to gross profits) and then for O'Connor to absorb personally any loss or expenses that may have resulted from the partnership. Rather, it is more likely that O'Connor was merely compensating Brazos for work performed on the consulting contracts based upon Brazos' work on the project, which will be addressed below.

Further, the testimony at trial was that this was a sharing of gross revenues, not net income. As noted above, Brazos testified that the agreement was to pay their own expenses, and it appears that most of the overhead was paid by O'Connor. The fact that expenses were not born by the partnership further refutes the existence of a partnership since this fact suggest that there was no true sharing of profits in this case. The Eastern District in *Binkley v. Palmer*, 10 S.W.3d 166, 172 (Mo.App. 1999), held that "[g]ross revenues are not profits and an agreement to pay a percentage of gross revenues is not the sharing of profits." There, the court noted that "Missouri courts have defined 'profit' as the benefit of or the advantage remaining after all costs, charges and expenses have been deducted from income." *Id.* Brazos' own evidence supports that this was not a true sharing of profits that would evidence a partnership.

Moreover, no inference of a partnership is drawn where a share of the profits was received by an employee in payment of wages. Section 358.070(4)(b).[5] *See also Nesler*, 703 S.W.2d at 525. Here, O'Connor prepared budgets for each of the projects based upon the amount of work he expected to expend. Brazos' compensation was based upon these amounts. He even testified that the "division of the profits" in the initial contract was a "divi-

sion of what we considered to be compensation for our work and our expenses." Thus, it is clear that he was being paid for services rendered on each project. Brazos' received compensation from H2O'C in which taxes, social security and unemployment was withheld. He also received W–2 forms from the corporation. While testimony from Brazos' brother indicates that it is not unusual for a partner to consider himself an employee and receive W–2 forms, there is no evidence that any other "sharing of profits" occurred apart from this compensation for services. Further, Brazos' individual income taxes during this time list his occupation as a sole proprietor and consultant. Finally, and likely the most significant indication that a partnership did not exist, when his association with O'Connor ended, he filed an unemployment claim with the Division of Employment Security. This was after consultation with his brother who was an accountant. He did not petition the court at that time to dissolve the partnership and enter an accounting to distribute the assets of the partnership, but chose instead to seek unemployment benefits.

Apart from his assertion that there was a sharing of profits, Brazos has failed to point to an intention or agreement to become partners, *Van Hoose*, 198 S.W.2d at 27, or to enter into a relationship that legally constitutes a partnership, *Meyer*, 949 S.W.2d at 82. Brazos has provided no indication that a discussion occurred between him and O'Connor concerning an intent or agreement to create a partnership to perform the consulting work. *C.f. id.* at 83 (proponent of partnership testified that a meeting occurred on a specific date in which she and partner agreed to

---

**5.** Section 358.070(4)(b) states that "The receipt by a person of a share of the profits of a business is prima facie evidence that the is a partner in the business, but no such inference shall be drawn in if such profits were received in payment: ... (b) As wages of an employee...."

form partnership). Brazos testified that he questioned O'Connor about their relationship several times before the March 1997 break-up. If there was an agreement to enter into a partnership, then Brazos would have had no question about the relationship. Brazos may have wanted to be a partner, but the evidence does not support a co-ownership of a business. *See Grissum v. Reesman*, 505 S.W.2d 81, 86 (Mo. banc 1974) (stating that "a partnership consists of a factual relationship between two or more persons who conduct a business enterprise"). The overwhelming evidence is that H2O'C was the business entity involved in the consulting services and O'Connor exercised control over the business enterprise. Brazos has provided no evidence of a "definite and specific agreement" to enter into a partnership or to conduct business as partners. *Shea v. Helling*, 826 S.W.2d 419, 421 (Mo.App. 1992) (quoting *Brotherton v. Kissinger*, 550 S.W.2d 904, 907 (Mo.App.1977)).

Likewise, as indicated above, there is no evidence that Brazos had a voice in the management of the business. Brazos did not have any say in the decision to bring O'Connor's son into the business. While he contributed to the budget preparation, it was O'Connor who negotiated the contracts and submitted the final budget. Because each of the contracts were executed in the name of H2O'C, Brazos, who stated that he did not have any interest in H2O'C, did not have the authority to enter into contracts on its behalf. It does not appear from the testimony that he had any control over the financial aspects of the relationship. While he may have had authority to order items needed for the project, he had no ability to disperse funds to pay for those items since they were paid through H2O'C, nor was there any other separate partnership account from which Brazos could disperse funds to pay partnership expenses. *C.f. Hillme v. Chastain*, 75 S.W.3d 315, 320 (Mo.App.2002) (one factor considered by the court in finding that a partnership existed was the opening of a joint checking account in the partnership name which authorized either party to issue checks).

Brazos' asserts that he was held out as a partner. He also states that in advertisements/papers to thousands of people he was represented as being a partner. In one, a brief biography of each is given with the statement "[t]ogether, they constitute H2O'C." In another both are pictured with brief statements about their expertise. Both of these, however, concern H2O'C. There is no indication of a partnership separate from H2O'C. Further, neither Brazos' business cards nor any advertisement stated specifically that he was a partner. They only suggest that he was working with H2O'C. Even if this court were to assume that "holding out" as a partner was sufficient to establish the existence of a partnership, the facts alleged by Brazos do not sufficiently establish a holding out as this court discussed in *Meyer v. Lofgren*, 949 S.W.2d 80 (Mo.App.1997). In *Meyer*, announcements were printed announcing that Meyer had joined the accounting firm as a "partner in charge of personal financial planning" and business cards indicated that she was a "partner of the firm." *Meyer*, 949 S.W.2d at 83.

Brazos also provides other evidence of a partnership. He claims that (1) both brought "unique talents" to the alleged partnership, (2) he purchased a microscope for use in the business, (3) he brought in the Premium Standard Farms project, and (4) he purchased a home based on the representations that their association would continue and that space was needed for a laboratory and for storage. None of this necessarily suggests the existence of a partnership.

While the talents of O'Connor and Brazos are different, this court cannot ignore the disparity in professional and educational background. This court is not saying that a partnership can only exist where the experience of the parties are similar, yet this evidence further supports that O'Connor was the principal in this enterprise. Their relationship began when Brazos worked on O'Connor's externally funded research projects. While Brazos may have supplied talents or skills distinct from those of O'Connor, some of those tasks were completed by others who were treated as independent contractors of H2O'C.

Second, Brazos purchased the microscope with his own money, even after O'Connor stated that it was not necessary for their business. Brazos testified that this was an instrument that he felt he had to have since it was how he earned his living, and there was evidence that Brazos conducted consulting apart from H2O'C. O'Connor offered to pay rent for the microscope.

Furthermore, when he purchased the house, O'Connor completed a verification of employment for the mortgage. The fact that he used part of his home for storage or lab space does not necessarily support the existence of a partnership. Nor does the fact that he brought a project to H2O'C. Although Brazos claims that he could have completed the project without the involvement of O'Connor, by his own testimony there were certain aspects of the project that he could not complete by himself.

The conduct of the parties in this case does not evidence the existence of a partnership. There was no true sharing of the profits. More importantly, under the facts here there was absolutely no evidence of any agreement or even thought given to sharing in the losses of the partnership or in assuming the burden of the partnership expenses. Nor was there evidence of a specific intention to enter into a partnership relationship. Brazos did not participate in the management of the partnership. He had no authority to issue checks or enter into contracts on behalf of the partnership. Thus, there is no indicia of a partnership relationship. *See Morrison,* 23 S.W.3d at 909.

This case does not rule out the establishment of sufficient evidence to support declaration of a partnership in the absence of a *written* agreement so long as there is agreement of the parties on sharing of profits, losses and ownership of partnership assets. *C.f. Cohoon v. Cohoon,* 627 S.W.2d 304, 305 (Mo.App.1981). In the case at bar, credibility issues aside, there was no evidence of any agreement on sharing of losses, for example, so the declaration of partnership must fail. Brazos' evidence failed to prove the existence of a partnership by clear, cogent and convincing evidence. There was no substantial evidence in support of the judgment of the trial court. Having determined that a partnership did not exist, the court need not address Appellants' remaining points. Since the parties do not challenge the entry of damages in the amount of $300 for conversion of personal property under Count IV, that portion of the judgment will be affirmed.

The judgment of the trial court is reversed and the cause remanded to the trial court to enter judgment finding that no partnership existed and awarding damages in favor Brazos under Count IV in the amount of $300.

All concur.