**Terry CLARK, Appellant,**

v.

**David FRANCIS, Respondent.**

No. WD 75829.

Missouri Court of Appeals,
Western District.

Oct. 29, 2013.

Motion for Rehearing and/or Transfer
to Supreme Court Denied Nov.
26, 2013.

Application for Transfer Denied
Feb. 4, 2014.

Terry J. Clark, Olathe, KS, pro se.

David F. Oliver and Timothy R. West, Kansas City, MO, for Respondent.

Before Division Three: KAREN KING MITCHELL, Presiding Judge, and LISA WHITE HARDWICK and GARY D. WITT, Judges.

KAREN KING MITCHELL, Presiding Judge.

Terry Clark appeals the denial of his declaratory judgment action against David Francis, in which Clark sought a declaration that he and Francis had a partnership agreement as to ownership of certain business entities. Clark argues that the trial court lacked subject matter jurisdiction over the claim because some of the property owned by the entities was located in Kansas. Clark further argues that the court's judgment was not supported by substantial evidence, was against the weight of the evidence, misapplied the law, and constituted an abuse of discretion. Finding no error, we affirm.

1. "We review all evidence, and all inferences that may be derived from the evidence, in the light most favorable to the trial court's judgment." *River Oaks Homes Ass'n v. Lounce*, 356 S.W.3d 855, 857 n. 1 (Mo.App.W.D.2012).

2. Prairie Highlands was initially owned by Prairie Highlands, LLC, which had numerous investors, including Francis. At some point

## Factual Background [1]

Sometime in 2001 or 2002, Francis and Clark first met when Clark worked as a marshal at the Prairie Highlands Golf Course, which was owned in part by Francis.[2] At the time, Clark's only compensation for his work was free golf. After their initial meeting, the two men had no further interactions with one another until May 2003, when the City of Olathe, Kansas, was contemplating building a public golf course approximately one-half mile from Prairie Highlands. Clark began collecting financial information from golf courses in the area in hopes of stopping the City from building the course, because he believed it to be a waste of taxpayer money. Clark suggested to Francis that the new course would be a threat to Prairie Highlands, so Clark and Francis began working together to stop the City's development of the new course.

After working as a marshal for two years and seeing Prairie Highlands's financial information, Clark believed that Prairie Highlands was not meeting its potential; thus, in July or August 2003, he suggested to Francis that he become a consultant and use Prairie Highlands "as a laboratory" to test some of his business ideas in the event that future business opportunities presented themselves. Francis agreed. From 2003 through 2006, Clark served as a business consultant for Prairie Highlands, and the only compensation he received was free golf, free meals, and free golf accessories.

before October 2006, another limited liability corporation—Heartland Golf Development (HGD)—was formed by Craig Shriner, Golf Course Architects, and Francis. HGD eventually purchased Prairie Highlands from Prairie Highlands, LLC, leaving only the three members of HGD as owners of the golf course. Clark was not a member of HGD.

Sometime after Clark began consulting with Francis, Francis became involved in additional business ventures connected with Clark. Clark had created a trust for his children, and among the assets of that trust were a tree farm (Coram Farms) and a strip-mall building (Shops at Sedona I). Coram Farms and Shops at Sedona I were initially owned by CV Enterprises, which consisted of the Clark Trust and Doug Veach (who served as trustee for the Clark Trust). At some point, Francis, his wife, and their two children formed an entity known as Apex, and Apex became a part owner, along with CV Enterprises, of both Coram Farms and Shops at Sedona I. A third entity was formed, CVF Enterprises, which consisted of the Clark Trust, Veach, and Apex. CVF Enterprises purchased a second building in the strip mall (Shops at Sedona II). Clark was not identified in any documentation as an owner, member, or partner of any of these entities (CV Enterprises, Apex, or CVF Enterprises).[3]

In the early part of 2006, Clark noticed that another nearby golf course, Hillcrest Country Club, appeared to be in distress, and he believed it had the potential to be a good investment. Clark suggested to Francis that he consider purchasing it and turning it around. In June or July 2006, Francis began seriously considering the idea and asked what Clark wanted out of it. Clark said that he would like to work on developing the business, and, once it became profitable and Francis was reimbursed for the money he invested, Clark wanted 50% of the profits. Clark refused to put anything in writing because he liked to "be below the radar screen." Francis ultimately agreed that he would purchase Hillcrest, allow Clark to run it in an effort to make it profitable, and then, after Francis recouped his investment, Francis and Clark would split the profits 50/50. Francis further agreed that, if the course became profitable, he would consider making Clark a part owner. Thereafter, Francis, his wife, and his two children formed a limited liability company, Heartland Golf Development II (HGD II), and on October 31, 2006, HGD II purchased Hillcrest.

At some point after the Hillcrest purchase, Clark mentioned in passing to Francis that he would like the arrangement they had with Hillcrest to also apply to Prairie Highlands. Francis indicated that, as long as he recouped the $4.6 million he had invested in Prairie Highlands, he would consider "something like that." There was no further discussion of the matter.

Until 2008, Clark received compensation only in the form of free golf and golf accessories, free meals, a company vehicle, and free gas. Clark indicated that he did not want any other compensation; he

**3.** As best we can discern from the record, the following chart identifies which entities (in italics) owned which property and who comprised each of the entities (in parentheses) at the time of trial:

| Property | Documented owner(s) at time of trial |
| --- | --- |
| Shops at Sedona I | *CV Enterprises* (the Clark Trust, Doug Veach/trustee) *Apex* (David Francis, Janis Francis, Emily Francis, John Francis) |
| Shops at Sedona II | *CVF Enterprises* (the Clark Trust, Doug Veach/trustee, Apex) |
| Coram Farms | *CV Enterprises* *Apex* |
| Prairie Highlands Golf Course | *Heartland Golf Development* (Craig Shriner, Golf Course Architects Inc., David Francis) |
| Links of Prairie Highlands | *Chris George Homes, Inc.* *Cedar Niles, LLC* *David and Janis Francis* |
| Hillcrest Country Club | *Heartland Golf Development II* (Apex) |

wanted the experience and to share in potential future profits. But, in 2008, upon the advice of either an accountant or an attorney, or both, Clark and Francis began receiving minimum wage payments.

In late 2008, there were accounting problems—purportedly caused by Veach— with Coram Farms, Shops at Sedona I, and Shops at Sedona II. Accordingly, Francis (either individually or through Apex) intended to become the sole owner of Coram Farms, Shops at Sedona I, and Shops at Sedona II. Francis believed that, once he acquired sole ownership of Coram Farms and the Shops at Sedona entities from the other partial owners, Clark wanted the same arrangement that they had regarding Hillcrest. Eventually, Francis reached an agreement with Veach whereby Francis (or Apex) owned 60% of the businesses, while the Clark Trust and Veach owned 40%.

As time went on, none of the businesses became profitable, except Prairie Highlands for a brief period, and that profit was not enough to satisfy the outstanding loans. Near the end of 2010, Francis advised Clark that he was running out of money and needed to start liquidating some of his assets. Clark protested the idea, informing Francis:

> It would serve no purpose to me to get nothing. I have 8 to 10 years invested. If you trust my judgment then you and I should be able to work out a deal. You in bankruptcy serves no benefit to me. But after all these years I feel I am entitled to be more than an employee. If you aren't comfortable with me and my judgment then maybe we have larg-

er problems. I want to be more than an inputter.

Clark suggested creating a liquidation agreement whereby he would be able to obtain some of the proceeds from the various sales. Francis was amenable to some sort of commission-based contract, but the two could never reach a final agreement.

In April 2011, Clark and Francis had a heated discussion, which ended with Clark telling Francis, "I quit." The next day, Francis went out to Prairie Highlands and Clark was there. Francis confronted Clark and asked what he was doing there since he had "quit," and Clark said, "no, I quit you." Francis advised Clark that if he "quit [Francis], he quit everything." Clark then threatened to take Francis "into receivership,"[4] and Francis responded by pointing out that he knew what their existing agreement was, to which Clark responded, "it's going to be my word against yours."

Thereafter, Francis and Clark had weekly meetings to discuss accounting, and Clark indicated that he would like to be in charge of the accounting to try to make some sense of it. Francis agreed, but indicated that he did not think their association with one another was working out very well. After a meeting on May 9, 2011, Francis attempted to access some financial records at Hillcrest but was denied access. He contacted Clark and asked what was going on. Clark initially indicated that he did not know, but later advised Francis that Francis did not need access to the records he was trying to see. Francis disagreed and demanded an imme-

---

4. "Whenever in a pending legal or equitable proceeding it appears to the court that a receiver is necessary to keep, preserve and protect any business, business interest or property, ... the court ... may appoint a receiver whose duty it shall be to keep, preserve and protect, to the extent and in the manner that the court may direct, that which the receiver is ordered to take into the receiver's charge." Rule 68.02(a). Presumably, Clark's threat was that he would seek a declaratory judgment regarding any interest he had in the businesses and seek a receiver to take over the businesses until a final decision was rendered.

diate meeting. Clark refused. The following day, Francis went to Clark's apartment to speak with him, but Clark refused to come downstairs. Francis then terminated Clark's employment and ordered him to leave the property.[5]

On June 20, 2011, Clark filed a lawsuit against Francis, seeking a temporary restraining order. On October 26, 2011, Clark filed his first amended petition, seeking a declaratory judgment,[6] declaring that he and Francis had a partnership agreement regarding ownership of Hillcrest Country Club, Prairie Highlands Golf Course, the Links at Prairie Highlands, Shops at Sedona I, Shops at Sedona II, Coram Farms, Heartland Golf Development I, Heartland Golf Development II, Heartland Golf Management, and CVF Enterprises.

At the bench trial, Francis testified that he and Clark came to an agreement in June or July 2006 regarding Hillcrest only and that the agreement was that Clark and Francis would equally split any of Hillcrest's future profits, but only after Francis and his family members were reimbursed for all the money they had invested. Francis also testified that Clark had mentioned, "in passing," that he would like the same agreement with Prairie Highlands, and Francis indicated that he was willing to consider it. Francis also believed that Clark wanted the same agreement as to Coram Farms and Shops at Sedona I and II, though Francis claimed it was never actually discussed.[7]

Clark testified that he and Francis made their initial agreement in September 2003, before Francis was ever involved in Coram Farms or either of the Shops at Sedona. Clark testified that the Prairie Highlands agreement was that Clark would be a 50% owner, that Francis would contribute the capital while Clark would handle the day-to-day management, that the two had equal authority, and that all decisions had to be mutually agreed upon. Clark further testified that he and Francis had an identical agreement as to Hillcrest. Clark agreed that, under the arrangement, Francis was to be reimbursed for all the money he invested before Clark would share in any profits. Clark then indicated that, in September 2008, Francis decided to take over full ownership of Coram Farms and the two Shops at Sedona, and that, when he did, he indicated that Clark would become a 50% owner of those entities as well. Clark testified that he attempted to terminate his children's trust in order to facilitate Francis's takeover, but he learned that he was unable to do so because his children's trust was irrevocable.[8]

Clark testified that he had no responsibility for any losses whatsoever; that he was never a named owner, member, or partner in any of the entities; and he acknowledged that there was no documentation evidencing his alleged ownership interest.

The trial court determined that Clark "failed to prove the existence of a partnership agreement by clear and convincing

---

**5.** Though not clear from the record, it appears as though Clark's apartment was provided by the businesses, free of rent, as some sort of compensation.

**6.** Clark also raised several other claims based on the alleged partnership that are not at issue in this appeal.

**7.** Although the Clark Trust was a part owner of Coram Farms, and the Shops at Sedona I

and II, neither party takes the position that Clark, himself, was a part owner of any of the entities through the trust. His only argument is that he, as an individual, was part owner of the entities by way of the alleged partnership agreement.

**8.** As noted, *supra,* Francis never acquired 100% ownership of Coram Farms or the Shops at Sedona I and II.

evidence." Specifically, the court found that Clark "failed to prove the existence of an agreement by all partner-owners of the entities in question[;] . . . failed to prove any specific agreement on terms, specifically [a]n agreement relating to bearing any financial risk or loss in certain proportions[; and] . . . failed to prove any specific agreement or terms on sharing profits and specifically when such profit-sharing would take effect." Clark appeals.

## Jurisdiction

■ Before we can address the merits of Clark's challenge to the trial court's judgment, we must address his first point on appeal, concerning the trial court's subject matter jurisdiction. For if Clark's argument that the trial court lacked subject matter jurisdiction is correct, then we are not at liberty to address the merits of his claims in this appeal.

In cases in which the trial court has entered a judgment when it did not have jurisdiction, we have jurisdiction of the appeal only to consider whether the trial court had jurisdiction. If we determine that the trial court did not have jurisdiction to enter a judgment, we cannot consider the merits of the appeal. Rather, we remand the case with instructions to vacate any order or judgment entered without jurisdiction.

State v. Callies, 389 S.W.3d 249, 252 (Mo. App.E.D.2012) (citing Estate of Shaw, 256 S.W.3d 72, 77 (Mo. banc 2008)).

The crux of Clark's argument is that, because the entities at issue are all located in Kansas, the trial court had no subject matter jurisdiction over the dispute.[9]

Clark relies on section 506.500, Missouri's long-arm statute for personal jurisdiction, in support.[10]

■ "Missouri courts recognize two kinds of jurisdiction: subject matter jurisdiction and personal jurisdiction." J.C.W. ex rel. Webb v. Wyciskalla, 275 S.W.3d 249, 252 (Mo. banc 2009). Both kinds of jurisdiction "are based upon constitutional principles." Id. "Personal jurisdiction is, for the most part, a matter of federal constitutional law[, while s]ubject matter jurisdiction is governed by article V of the Missouri Constitution." Id. The distinction, here, is vital, for a claim of "[l]ack of subject matter jurisdiction is not subject to waiver; it can be raised at any time, even on appeal." McCracken v. Wal–Mart Stores East, LP, 298 S.W.3d 473, 476 (Mo. banc 2009). A claim that a court lacked personal jurisdiction, however, "may be waived because it is a personal privilege." State ex rel. Lambert v. Flynn, 348 Mo. 525, 154 S.W.2d 52, 57 (1941).

■ Clark's argument appears to conflate the two concepts. To the extent he is arguing that the trial court lacked personal jurisdiction over him (as evidenced by his reliance on Missouri's long-arm statute for acquiring personal jurisdiction and cases discussing personal jurisdiction), he waived this claim when he filed his petition in Jackson County Circuit Court, claiming: "Jurisdiction and venue are proper in this Court."

■ Clark also argues, however, that the trial court lacked subject matter jurisdiction because all of the entities at issue and the real property they own are located

9. The record is unclear as to whether all of the entities and the properties they own are located in Kansas. Clark's brief claims that all of them are, but, at oral argument, it was acknowledged that one of the entities was actually located in Missouri. Regardless of the location of the entities and their respec-tive real property, our analysis remains the same.

10. All statutory references are to Missouri Revised Statutes 2000, as updated through the 2012 Cumulative Supplement, unless otherwise noted.

in Kansas and his declaratory judgment action allegedly affects title to the real estate owned by the entities.[11] In making this argument, Clark relies on section 508.030, which provides: "Suits for the possession of real estate, or whereby the title thereto may be affected, or for the enforcement of the lien of any special tax bill thereon, *shall be brought in the county where such real estate, or some part thereof, is situated.*" (Emphasis added.)

 There are two major flaws in Clark's argument. First, section 508.030 is a venue statute, and does not affect a trial court's subject matter jurisdiction.[12] *HFC Invests., LLC v. Valley View State Bank*, 361 S.W.3d 450, 453 n. 2 (Mo.App. W.D.2012). Second, "[c]ourts of general jurisdiction have the authority to hear all types of actions, . . . and the location of the transaction or controversy is usually not determinative of subject matter jurisdiction." *Mission Med. Grp., P.A. v. Filley*, 879 S.W.2d 743, 745–46 (Mo.App.W.D. 1994) (rejecting the argument that the trial court lacked subject matter jurisdiction over a negligent supervision claim for damages merely because the property that was damaged was located in Kansas).[13] Furthermore, Clark's suit sought a declaration that a partnership existed between he and Francis regarding the ownership of various entities. Clark's claimed interest in the entities was a personal property

interest, not a real property interest, rendering section 508.030 inapplicable. *Wehrheim v. Brent*, 894 S.W.2d 227, 229 (Mo. App.E.D.1995) ("A partner's interest in a partnership is personal property."); § 358.260.

In short, the trial court had personal jurisdiction over Clark and subject matter jurisdiction over his claims. Thus, we deny Point I and turn to the merits of Clark's claim on appeal regarding the denial of his request for declaratory judgment.

## Standard of Review

 "Although the trial court denied the . . . declaratory judgment and issued a judgment in favor of the Respondent[ ], we review this case under the same standard as if the declaratory judgment was ordered." *Andresen v. Bd. of Regents of Mo. W. State Coll.*, 58 S.W.3d 581, 585 (Mo.App.W.D.2001). "This court reviews a declaratory judgment under the standard applicable to other court-tried cases." *Id.* In other words, we will "affirm the trial court's judgment regarding issues of fact unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Id.* "We review questions of law de novo." *Id.*

---

11. It appears that, but for the location of the properties owned by the entities at issue, Clark would have no dispute with the trial court's subject matter jurisdiction. And, indeed, such a challenge would be without merit. "Subject matter jurisdiction, in contrast to personal jurisdiction, is not a matter of a state court's power over a person, but the court's authority to render a judgment in a particular category of case." *Webb*, 275 S.W.3d at 253. "Missouri's constitution is unequivocal in stating that circuit courts 'have original jurisdiction *over all cases and matters*, civil and criminal.'" *McCracken*, 298 S.W.3d at 476–77 (quoting Mo. Const. art. V, sec. 14). Because

Clark brought a civil action, the trial court had subject matter jurisdiction.

12. Clark has also, through his petition, waived any challenge to the appropriateness of the venue below.

13. In *Mission Medical Group*, the court discussed the historical context of Clark's argument regarding the effect of suits affecting or involving title to real estate on the trial court's subject matter jurisdiction and determined that the distinction is no longer followed in Missouri. *Mission Med. Grp.*, 879 S.W.2d at 745–46.

## Analysis

Clark argues that the trial court's finding of no partnership was based on a misapplication of section 358.180(7), which states that "[n]o person can become a member of a partnership without the consent of all the partners." He argues that the evidence demonstrated that the agreement he and Francis made arose *before* any of the entities at issue were created; thus, he and Francis's alleged partnership predated all other partnerships at issue, thereby requiring the other individuals and entities involved to first obtain *Clark's* consent, rather than the other way around. Alternatively, he argues that the evidence was uncontested that his agreement with Francis arose at least before the purchase of Hillcrest and should therefore be applied, at a minimum, to that entity.

Despite his claim to the contrary, Clark's argument is *not* that the trial court misapplied the law; in fact, Clark urges the exact same application given by the trial court, but he suggests that the proper application dictates a different outcome when the facts are viewed in the light most favorable to his position. Thus, his true quarrel is with the trial court's factual findings and not the manner in which it applied section 358.180(7).

"Appellate courts defer to the trial court on factual issues 'because it is in a better position not only to judge the credibility of witnesses and the persons directly, but also their sincerity and character and other trial intangibles which may not be completely revealed by the record.'" *White v. Dir. of Revenue,* 321 S.W.3d 298, 308–09 (Mo. banc 2010) (quoting *Essex Contracting, Inc. v. Jefferson Cnty.,* 277 S.W.3d 647, 652 (Mo. banc 2009)). "The appellate court's role is not to re-evaluate testimony through its own perspective." *Id.* at 309. "Rather, the appellate court confines itself to determining whether substantial evidence exists to support the trial court's judgment; whether the judgment is against the weight of the evidence—'weight' denoting probative value and not the quantity of evidence; or whether the trial court erroneously declared or misapplied the law." *Id.* (internal citations omitted).

Here, there was ample evidence in the record from which the trial court could find that the agreement between Clark and Francis was made with respect to Hillcrest only and nothing else. We will not second-guess the trial court's finding.

As to the agreement regarding Hillcrest, the trial court found that Clark "failed to prove any specific agreement on terms, . . . relating to bearing any financial risk or loss in certain proportions . . . or . . . on sharing profits and specifically when such profit-sharing would take effect."

"The law never presumes the existence of a partnership, but he who asserts its existence has the burden of showing such existence." *Winslow v. Nolan,* 319 S.W.3d 497, 501–02 (Mo.App.E.D. 2010). "The plaintiff bears the burden of proof of presenting cogent, clear, and convincing evidence that the parties entered a definite and specific partnership agreement." *Id.* at 502. A partnership agreement need not be written or verbally expressed but, instead, can be "implied from the acts and conduct of the parties themselves." *Nesler v. Reed,* 703 S.W.2d 520, 523 (Mo.App.E.D.1985).

"A partnership is judicially defined as 'a contract of two or more competent persons to place their money, effects, labor and skill, or some or all of them, in lawful commerce or business and to divide the profits and bear the loss in certain proportions.'" *Winslow,* 319 S.W.3d at 501 (quoting *Meyer v. Lofgren,* 949 S.W.2d 80,

82 (Mo.App.W.D.1997)). "[I]t is not sufficient to create a partnership that the parties were to share the profits of a given enterprise or transaction[; t]hey must also have agreed, that is, intended to share the losses and to become partners." *Van Hoose v. Smith*, 355 Mo. 799, 198 S.W.2d 23, 27 (1946). "It is [also] not sufficient for plaintiff to adduce evidence from which inferences might with equal reasonableness be drawn to support either a finding that plaintiff was an employee or that he was a partner." *Bussinger v. Ginnever*, 213 S.W.2d 230, 237–38 (Mo.App.1948).

 Here, the evidence plainly supported the trial court's conclusion that Clark and Francis did not agree to share losses. While there was obviously some agreement regarding future profits, that agreement was conditional and included no provisions for sharing losses.

> "The mere agreement to form a partnership does not of itself create a partnership, nor does the advancement by one of part of his agreed share of the capital. Persons who have entered into a contract to become partners ... *upon the happening of some future contingency* do not become partners until or unless ... the contingency has happened."

*Goodwin v. Winston*, 241 Mo.App. 357, 230 S.W.2d 793, 796 (1950) (emphasis added) (quoting 47 C.J. *Partnership* § 48 (1929) (internal citations omitted)). Both parties agreed that Clark was not to share in any profits unless and until Hillcrest became profitable *and* Francis and his family were reimbursed for all of their contributions. As neither of those conditions came to be, neither did the alleged partnership. Fur-

thermore, the agreement itself included no provision for sharing losses. "Mere participation in the profits, without an intention to become a partner and share losses, will not make parties partners as between themselves." *Nat'l Bank of Commerce v. Francis*, 296 Mo. 169, 246 S.W. 326, 332 (1922).

The evidence also tends to support a finding that Clark was merely an employee and not a partner. Clark appeared to recognize his employee-like status when he protested Francis's decision to liquidate assets before they turned a profit, stating:

> It would serve no purpose to me to get nothing. I have 8 to 10 years invested. If you trust my judgment then you and I should be able to work out a deal. You in bankruptcy serves no benefit to me. But after all these years *I feel I am entitled to be more than an employee.* If you aren't comfortable with me and my judgment then maybe we have larger problems. *I want to be more than an inputter.*

(Emphasis added.) Clark also appeared to recognize his own status as something less than a partner when he told Francis that he "quit." And while Clark certainly contributed time and effort, "merely 'helping out' in a business is not sufficient proof of a partnership." *Brotherton v. Kissinger*, 550 S.W.2d 904, 908 (Mo.App.1977).

In sum, the trial court's denial of Clark's request for declaratory judgment was supported by sufficient evidence, was not against the weight of the evidence, and was not based upon a misapplication of the law.

Point II is denied.[14]

---

**14.** We deny Respondent's request for an award of damages based on the allegedly frivolous nature of this appeal.

## Conclusion

The trial court's judgment is affirmed.

LISA WHITE HARDWICK and GARY D. WITT, Judges, concur.