

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| **TOOBAROO, LLC,** | ) | |
| | ) | |
| Respondent, | ) | **WD83169** |
| **v.** | ) | **(Consolidated with WD83182)** |
| | ) | |
| | ) | **OPINION FILED:** |
| **WESTERN ROBIDOUX, INC.,** | ) | **September 22, 2020** |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
**The Honorable S. Margene Burnett, Judge**

**Before Division One:** Thomas H. Newton, Presiding Judge, and
Mark D. Pfeiffer and Edward R. Ardini, Jr., Judges

Western Robidoux, Inc. ("WRI") appeals the judgment of the Circuit Court of Jackson County, Missouri ("trial court"), following a jury verdict in favor of TooBaRoo, LLC ("Toobaroo") on Toobaroo's claim that WRI breached a joint venture agreement, awarding damages of $1,134,372. On appeal, WRI raises sufficiency of the evidence, evidentiary error, and instructional error challenges to the judgment. We affirm.

**Factual and Procedural Background**[1]

In 1979, Roger and Connie Burri purchased WRI, a commercial printing and fulfillment company. The couple had three sons, Breht,[2] Peter, and Brian, who all grew up working for WRI. Brian married Cindy in 1997, and she began working for WRI also. Roger and Connie owned all shares of WRI until May of 2009, when Roger passed away, at which point Connie controlled all of the stock in WRI. Connie began gifting shares equally to her sons in December 2009. Following Roger's death, Connie elected herself and Breht, Brian, and Peter to WRI's Board of Directors, and the Board elected Connie as WRI's President. Connie remained President and majority shareholder of WRI through trial.

Brian acted as the Chief Financial Officer of WRI, was in charge of entering the payroll, and was the point of contact with WRI's payroll vendor CBIZ. Brian's wife, Cindy, was promoted from production manager to Chief Executive Officer of WRI in April of 2014. Peter handled maintenance issues and considered himself the plant manager.

Breht started, exclusively owned, and controlled multiple technology companies in the 1990s, including Toobaroo. Toobaroo is a company that created and licensed software, internet or web-based software, databases, and other types of information technology. Around 1996 or 1997, Breht negotiated a business relationship between Toobaroo and individuals at Boehringer Ingelheim Vetmedica, Inc. ("BI") to provide software services. BI had also been a client of WRI since 1989 for printing and bulk mailing services. Toobaroo went from designing one website for

---

[1] In reviewing the denial of a motion for directed verdict and the denial of a motion for judgment notwithstanding the verdict, "[t]he court views the evidence in the light most favorable to the jury's verdict, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict." *Sanders v. Ahmed*, 364 S.W.3d 195, 208 (Mo. banc 2012). "In reviewing a trial court's order denying a motion for a new trial, the evidence is viewed in a light most favorable to the trial court's order." *St. Louis Cty. v. River Bend Estates Homeowners' Ass'n*, 408 S.W.3d 116, 134 (Mo. banc 2013).

[2] Because the relevant individuals share the same last name, this opinion will refer to them by first name for clarity. No familiarity or disrespect is intended.

one division of BI to designing all of the divisions' websites, including hosting these websites and performing other computer-related work.

In 2002, Breht adapted software he had previously created to form the BI Literature Store ("Lit Store"). The Lit Store software interacted with users like an online store, through which the BI salesperson selected which marketing materials to order and then checked out, and the software electronically conveyed the orders to a fulfillment company where the materials were then pulled, packed, and shipped. The initial version of the Lit Store served about sixteen BI salespeople, and over the following two years it was modified to serve three additional BI divisions. In short, the Lit Store software was a very successful software creation by Toobaroo.

When Breht began working with BI, it did not use WRI for fulfillment; but when a division manager told Breht that BI wanted a new fulfillment house, Breht referred the opportunity to WRI and, by 2006, WRI was BI's only fulfillment provider. As more BI personnel used the Lit Store, more fulfillment and printing business was created for WRI, and by the end of 2008, all of BI's divisions used the Lit Store.

In 2009, an analyst employed by BI named Chris Curtiss told Breht he was no longer to "engage in business development activity [at BI] without my involvement" according to certain "rules of engagement" he provided. Because Mr. Curtiss and his demands were a threat to Toobaroo's business, as well as indirectly to WRI due to its reliance on the Lit Store for BI's business, and because Breht anticipated that Mr. Curtiss's actions toward Toobaroo foreshadowed actions he may take toward WRI, Toobaroo and WRI entered into a joint venture agreement in order to protect their mutually successful business relationships.

The joint venture agreement was reached in October 2009 between Connie, on behalf of WRI, and Breht, on behalf of Toobaroo. Pursuant to the joint venture agreement, Breht agreed to

3

contribute his software and services through his solely-owned corporate entity, Toobaroo, to WRI and WRI agreed to compensate Toobaroo the identical amount it paid to Breht's brothers, Brian and Peter, such that each Burri brother (Breht's share via Toobaroo) would receive the identical WRI compensation on an annual basis.

Pursuant to the agreement, Toobaroo or its designee[3] would invoice WRI and be paid weekly the amount of Breht's brothers' compensation plus an additional sum to offset self-employment tax. Further, Toobaroo was also entitled to identical bonuses that were paid to Breht's brothers, which historically, was a significant amount of annual compensation for the brothers. The joint venture agreement was a change from the prior business relationship between Toobaroo, WRI, and BI, which consisted of Toobaroo billing BI for providing its programming and web hosting services and separately billing WRI for programming services for maintaining and upgrading WRI's end of the Lit Store, and WRI billing BI separately for its fulfillment services. Under the joint venture agreement, by contrast, Breht worked as many hours as necessary with WRI and contributed his time and Toobaroo's software at no additional charge.

The joint venture was immediately successful for all parties and grew in profitability. From 2009 through 2013, WRI's total revenue went from just under three and a half million dollars to over seven million dollars. In 2009 when the joint venture began, Toobaroo had about five hundred Lit Store users at BI. Thereafter, Breht (via Toobaroo) created a new software version called the distributor Lit Store and roughly three thousand additional distributor users began utilizing the new deployment in 2010. That year, BI merged with another animal health company, which led to more users, more sales representatives, and a huge demand for new marketing materials,

---

[3] Breht solely owned another corporate entity, InfoDeli, LLC, and sometimes Toobaroo would direct its joint venture agreement payment to be made to InfoDeli, LLC, which was never an issue for WRI as WRI knew that both corporate entities were solely owned by the ultimate recipient of the joint venture compensation, Breht. That said, Toobaroo never assigned its rights under the joint venture agreement to any other person or entity.

4

resulting in greater business for the joint venture. In January 2010, Brian increased his weekly compensation, and in October of that year his and Peter's pay increased to $2,885 weekly. Brian and Peter also received over $85,000 in bonus payments in 2010. These payments were surreptitiously made without Breht or Toobaroo's knowledge.

Conversely, Breht remained committed to WRI's success and was instrumental in evaluating, choosing, and teaching WRI employees to use a new variable data printing press for printing projects of the joint venture. Toobaroo also did a lot of variable data project work with bar codes and QR codes for improved efficiency and automation of the processes used with joint venture client services. This work served as a precursor to one of the joint venture's most lucrative subsequent projects for a new client, CEVA. Toobaroo's day-to-day joint venture work also included making improvements to the Lit Store, adding and changing users, user lists, and products, generating reports for a particular product or for sales for clients, and assisting WRI employees with questions as to the Lit Store.

In January 2011, Brian and Peter began taking higher weekly pay, again without notifying Breht. Breht inadvertently discovered some of Brian and Peter's deceit in July 2011, and requested Connie to bring the pay to Toobaroo to parity with Brian and Peter pursuant to the joint venture agreement. Toobaroo's invoice was then increased accordingly at Connie's direction. Also in 2011, a BI marketing sales executive left BI and went to work at CEVA, and asked Breht to be involved in discussions that led to the beginning of a business relationship between WRI and CEVA. Breht's contacts with CEVA were being pressured by other parts of their company to use a CEVA software system and integrate it with WRI's fulfillment, but, having compared the two systems, Breht's CEVA contacts wanted to use Toobaroo's Lit Store, and ultimately CEVA chose to use Toobaroo's system. Hence, once again, Breht and Toobaroo's value to WRI was

5

demonstrated and Breht remained loyal to the commitment he made to WRI in the joint venture agreement.

Around the end of 2011 and beginning of 2012, fulfillment business from BI had outgrown the space WRI had, and Breht (Toobaroo) developed a database system and software for a temporary warehouse space initially, and then a new WRI warehouse that was used to map, catalog, track materials, and coordinate with allotting client billing for each item and each space in the building. The new warehouse was built due to the growth of the BI fulfillment business as well as in anticipation of CEVA becoming a fulfillment client through the joint venture. All of this business was developed as a direct result of Breht's contacts with CEVA and his software creation expertise.

In March 2012, Breht again noticed discrepancies in compensation contrary to the joint venture agreement and raised his concerns with Connie, following which $20,000 was paid to Toobaroo. In the fall of 2012, the joint venture began discussions with CEVA that led to their collaboration on the Vectra Rebate marketing program. The program relied on a system Breht created in conjunction with the Lit Store that generated variable data allowing the materials, products, sales representatives, clients, territory, and coupon group involved to be tracked. In December 2012, Brian and Peter surreptitiously took $50,000 bonuses from WRI and, again, did not advise Breht of the bonuses.

The Vectra Rebate program launched in January of 2013. The Vectra Rebate program was highly successful resulting in record-high revenues for the joint venture, with gross sales by WRI to CEVA increasing from just over one million dollars in 2012 to over four million dollars in 2013. In January of 2013, Brian's and Peter's salaries increased to $3,000 a week—without a corresponding increase to Toobaroo as required by the joint venture agreement.

6

In March 2013, the joint venture was performing exponentially more fulfillment projects for CEVA and BI was also continuing to grow by adding one hundred new sales representatives using the venture's services across the country. The fulfillment side of WRI was growing and experiencing such great success with BI and CEVA that it was feeding their print business. With the great growth and success of the joint venture, Toobaroo was taking on a significant portion of the joint venture's responsibilities.

On April 26, 2013, Brian's and Peter's salaries increased to $5,000 weekly. In August of 2013, Brian's and Peter's salaries increased to $10,000 a week. From June through August of 2013, Brian and Peter each received $150,000 in bonus payments. Again, these raises and bonuses were surreptitiously made and Toobaroo was not included in the increased compensation structure—even though Toobaroo's software was the reason for the joint venture's enormous financial success.

In September 2013, Breht again became concerned that bonuses were being taken and salaries of his brothers increased without his knowledge, and in response to his email about those concerns, Connie raised Toobaroo's weekly compensation and promised a $50,000 bonus the following week, though Breht was not told the actual salaries and bonuses that were being taken by his brothers at that time.

In January 2014, Breht emailed Connie, Brian, Cindy, and Peter demanding an accounting for total compensation to Peter, Brian, and Cindy for 2011 through 2013 immediately and demanding they prepare a plan to equalize difference in compensation for Brian and Peter versus Toobaroo's compensation for the same period of time. WRI's attorney then intervened and all further conversations on this topic were with WRI's counsel.

In February 2014, Brian and Cindy convinced Peter and Connie to participate in a scheme to oust Breht and Toobaroo from the joint venture. WRI did not want Breht to know of the scheme, so WRI represented that they were negotiating with Toobaroo when, in fact, WRI had hired a replacement vendor to replace the Lit Store, replace the Vectra Rebate website, and replace all of Breht's and Toobaroo's other services and contributions to the joint venture. The replacement vendor worked on replicating key parts of the Lit Store without Breht's knowledge. WRI requested their contact at CEVA to convince Breht to transfer a vital data file to him for WRI to provide to their replacement vendor to help them develop the replacement software.[4] By March 31, 2014, WRI ceased paying Toobaroo and was no longer allowing Toobaroo to provide its software and services to the joint venture.

Using the replacement vendor's software and related services with BI and CEVA, WRI carried on the business that was formerly that of the joint venture through at least November of 2015. In 2015, Brian was compensated $316,000 and Peter was compensated $307,000.

Toobaroo filed a lawsuit in 2017 against WRI, Peter, Cindy, Brian, and Connie, seeking damages for breach of the joint venture agreement, among a litany of other counts that are not relevant to this appeal. WRI denied all Plaintiffs' claims, raised affirmative defenses, and alleged counterclaims, none of which were meritorious at the conclusion of the case.

Trial was held April 9 through 18, 2018. Cindy, Breht, Brian, Peter, Connie, and two experts testified at trial.

---

[4] WRI takes the position that the only reasonable interpretation of the evidence is that Breht was nothing more than an employee providing software development and other software related services to WRI at all relevant times. But, if that were true, the software developed for WRI by Breht was WRI's property and there was no need to "trick" Breht into obtaining data files to replicate the very software that would already belong to WRI. Instead, the reasonable inference about this evidence is that WRI was tricking its business partner (Toobaroo) into providing information necessary to replicate the work product of Toobaroo so that it could later oust this partner from the profitable joint venture and keep the profits to itself.

Toobaroo's expert witness on damages, economist Dr. Kurt Krueger, analyzed payroll data and determined that Breht, Brian, Peter, and Cindy received $4,426,180 from 2010 through March 31, 2014, the payments to each reflecting a mixture of labor and profit. To calculate Toobaroo's share of the profits, Dr. Krueger determined the labor costs in the payments and subtracted that amount from the total amount distributed to each as salaries and bonuses, basing his assumptions of labor cost upon their historical salary of $150,000, noting that was well above the market rate for their jobs, which ranged from $80,000 to $100,000 in the area, and increasing it 5% each year through March of 2013. Adding these salaries and multiplying by four, Dr. Krueger testified that his opinion was that the labor components of the compensation to Breht, Brian, Peter, and Cindy from 2010 through March 31, 2014, totaled $2,768,770.

Dr. Krueger then subtracted this labor cost from the total compensation paid to Breht (via Toobaroo), Brian, Peter, and Cindy during the same time period, $4,426,180, to yield the amount of profit that should have been equally shared among Toobaroo, Brian, and Peter in accordance with the joint venture agreement, which he concluded was $1,657,410. After relevant expenses, each brother should have received $1,244,663. Toobaroo actually received $853,433. Dr. Krueger opined that the difference was $391,230, which he concluded to be Toobaroo's damages from October of 2009 to March 31, 2014, due to WRI's breach.

The second component of Dr. Krueger's damages opinion was the present value of Breht's (i.e., Toobaroo's) share of the joint venture as of March 31, 2014. Based on the profits the joint venture generated in 2014, Krueger testified that the appropriate valuation was $1,134,142 for a five-year period or $1,380,969 for a seven-year period.

The jury found in favor of Toobaroo on the breach of joint venture claim and awarded Toobaroo $1,134,372 in damages. The trial court entered judgment in accordance with the verdict

9

and denied WRI's Motion for Judgment Notwithstanding the Verdict, a New Trial, or to Amend the Judgment and Plaintiffs' Motion to Amend Judgment, except to change the date range for prejudgment interest.

WRI timely appealed.

## Analysis

In its first and second points on appeal, WRI argues that the trial court erred in denying WRI's motion for directed verdict and motion for judgment notwithstanding the verdict because (I) Toobaroo did not present sufficient evidence from which a jury could reasonably find a joint venture existed between WRI and Toobaroo, and (II) breach of joint venture damages were not supported by substantial evidence.

## Issue Preservation

Rule 72.01 governs motions for directed verdict and motions for judgment notwithstanding the verdict.[5] Rule 72.01(a) requires that a motion for directed verdict "state the specific grounds therefor." Rule 72.01(b) allows a motion for directed verdict at the close of all the evidence, and for the party having such motion denied to so move again following the verdict and judgment entered thereon and/or to request new trial.

> In terms of preservation, a motion for directed verdict at the close of plaintiff's case is necessary only if defendant seeks to have the case determined at that point without introduction of additional evidence. Alternatively, if defendant chooses to put on evidence,[6] the state of the record changes. The case then is decided on all of the evidence. A motion for directed verdict at the close of all evidence becomes the meaningful motion to preserve the issue as it presented itself to the trial court at that time, prior to submission to the jury.

*Sanders v. Ahmed*, 364 S.W.3d 195, 207 (Mo. banc 2012).

---

[5] All rule references are to I MISSOURI COURT RULES – STATE 2020.
[6] Here, the defendants did, in fact, present evidence in the defendants' case in chief.

Here, the record on appeal is unclear on the topic of whether WRI submitted a motion for directed verdict after the close of all evidence. WRI admits that it did not file a written motion for directed verdict at the close of all evidence; rather, WRI asserts that the motion was orally made to the trial court. However, it appears that any such oral motion was made "off the record" as there is no transcript record documenting the oral motion.

In fact, WRI expressly *admits* in its brief that "[c]learly, relevant portions of the record are omitted." Notably, in spite of this acknowledgement, WRI made *no attempt* to supplement the *admittedly* incomplete record on appeal pursuant to Rule 81.12(f), which provides that the parties *shall* direct the omission to be corrected by stipulation if anything material is omitted from the record. The burden is on the appellant to submit the record necessary for appellate review. *Finch v. Finch*, 442 S.W.3d 209, 218 (Mo. App. W.D. 2014).

That said, the trial court's "Jury Trial Minutes and Judgment on Claims of Plaintiff Toobaroo, LLC" states that after the defendant (WRI) had presented evidence in its case in chief, "Defendant moves for a Directed Verdict at the close of all evidence. The Court, having heard arguments of counsel, DENIED said motion."

This lends credence to WRI's claim that it orally renewed the identical arguments from its previously filed motion for directed verdict. Further, WRI is not attempting to assert any new issues on appeal that were not raised in its originally filed motion for directed verdict, something which we would not tolerate on appeal. *Howard v. City of Kansas City*, 332 S.W.3d 772, 791 (Mo. banc 2011) (holding that because the appellant did not argue an issue it raised in its appeal in its motion for directed verdict, it failed to preserve the issue for appeal); *Heifetz v. Apex Clayton, Inc.*, 554 S.W.3d 389, 395 (Mo. banc 2018) ("[T]o preserve a submissibility issue for appellate review,

11

it must be included in a motion for directed verdict at the close of all evidence[.]"); *Tharp v. St. Luke's Surgicenter-Lee's Summit, LLC*, 587 S.W.3d 647, 653 (Mo. banc 2019).

The best practice for trial attorneys is to file written motions at trial that can be filed with the court and become part of the record on appeal with much more clarity. However, should a trial attorney rely upon an oral motion, such trial counsel should be meticulous about ensuring that the oral motion is appropriately documented "on the record."

That said, because the trial court's jury trial minutes confirm that WRI renewed its motion for directed verdict at the close of all evidence and WRI is not attempting to assert any new issues on appeal that were not contained in its originally filed motion for directed verdict, we conclude that the issues presented are preserved for our review on appeal.

**Points I and II**

Our careful review of the record with the appropriate lens of factual review shows that Toobaroo made a submissible case of joint venture and damages from WRI's breach thereof.

The standards for reviewing the denial of a motion for directed verdict and the denial of a motion for judgment notwithstanding the verdict are essentially the same. *Sanders*, 364 S.W.3d at 208. We view the evidence in the light most favorable to the jury's verdict, affording the plaintiff all reasonable inferences ***and disregarding all contrary evidence and inferences***.[7] *Inv'rs Title Co. v. Hammonds*, 217 S.W.3d 288, 296 (Mo. banc 2007). The question is whether or not the plaintiff made a submissible case, and reversal is warranted "only where there is a complete absence of probative fact to support the jury's conclusion." *Id.* A case is submissible where "legal and substantial evidence supports each fact essential to liability." *Sanders*, 364 S.W.3d at 208.

---

[7] Much of the recitation of facts and argument by WRI on appeal ignore this lens of factual review and present evidence and arguments in the light most favorable to the defendants' argument below and *not* the jury's verdict. Simply put, we will not indulge arguments that ignore our lens of factual review.

12

A joint venture is a type of partnership. *Firestone v. VanHolt*, 186 S.W.3d 319, 324 (Mo. App. W.D. 2005). Though it is a consensual arrangement, a joint venture requires no particular formalities. *Id.* A joint venture is "an association of persons to carry out a single business enterprise for profit, for which purpose they combine property, effort, skill and knowledge." *Sheridan v. McBaine*, 660 S.W.2d 188, 194 (Mo. App. W.D. 1983). "The relationship arises only from contract, but the agreement may be established without formal terms, and implied from circumstances that such an enterprise was in fact entered into." *Id.* A joint venture's essential elements are:

> (1) an express or implied agreement among members; (2) a common purpose to be carried out by the members of the group; (3) a community of pecuniary interest in the common purpose; and (4) an equal voice, giving an equal right of control in the direction of the enterprise.

*Thompson v. Tuggle*, 183 S.W.3d 611, 616 (Mo. App. W.D. 2006) (quoting *Eads v. Kinstler Agency, Inc.*, 929 S.W.2d 289, 292 (Mo. App. W.D. 1996)).

*Agreement:*

Here, in addition to being evident from the conduct and circumstances following the parties entering the agreement, there was testimony establishing an express joint venture agreement. Breht testified that he and Connie had discussed the threat to Toobaroo's and WRI's business with BI posed by Mr. Curtiss, and that led to them reaching an agreement wherein Breht, via Toobaroo, would work directly with WRI, with Breht keeping the Lit Store going for WRI, working as much as needed for WRI, and being financially compensated by WRI equally to his brothers in exchange for his work and Toobaroo's software. That "equal" compensation meant that when profits were up the compensation would rise, but if profits were down the compensation would decrease. Irrespective, "when the essentials of such an agreement have been established, expressly or by implication, it is not to be avoided because of uncertainty or indefiniteness as to minor details and,

13

in the absence of express agreement, it will be presumed that profits are to be shared equally." *Grissum v. Reesman*, 505 S.W.2d 81, 86 (Mo. 1974). Breht also testified that the agreement as to compensation included bonuses, as he knew from his family history with WRI that a significant amount of compensation came through bonuses. The conduct of the parties (i.e., payment of salary invoices and bonus payments to Toobaroo) made evident that the agreement contemplated by Breht and Connie was, in fact, an agreement that the parties were initially abiding by. And, for good reason—as Toobaroo's software was making Breht's entire family extremely wealthy.

WRI argues that the agreement expressed was too vague to reflect a meeting of the minds as to the purpose, scope, or objectives of an alleged joint venture or the roles, responsibilities, duties, or obligations of the parties thereto. However, any "uncertainty in the duration, or want of some definiteness of the details of enterprise," such as that argued by WRI, "does not undermine the relationship where the intention to enter the adventure is established." *Sheridan*, 660 S.W.2d at 194. The remainder of WRI's argument simply references evidence and inferences contrary to the jury's verdict, in derogation of our standard of review, and which we will not indulge with further analysis.

### Common Purpose:

WRI concedes the proof as to the common purpose element of joint venture.

### Community of Pecuniary Interest:

"Sharing profits and losses is evidence of a community of economic interest." *Ritter v. BJC Barnes Jewish Christian Health Sys.*, 987 S.W.2d 377, 388 (Mo. App. E.D. 1999) (citing *Jeff-Cole Quarries, Inc. v. Bell*, 454 S.W.2d 5, 16 (Mo. 1970)). However, "[t]here need not necessarily be an agreement to share losses." *Pigg v. Bridges*, 352 S.W.2d 28, 33 (Mo. banc 1961). Here, the evidence gave rise to the reasonable inference that each of the parties to the joint venture

14

shared in the profits of the joint venture through increases in weekly draws and payment of bonuses, which increased as the joint venture experienced greater success with BI, and even more following the addition of CEVA as a client of the joint venture. And, likewise, in at least one instance in December 2013, Connie made the decision that the profits did *not* justify bonuses, so none were had. In other words, this "equality" of compensation cut both ways, depending on profits or losses throughout the year. That said, the joint venture was regularly very profitable; yet the evidence was clear that Brian and Peter were not providing increased salaries and bonuses to Toobaroo that were equal to those that Brian and Peter were taking for themselves.

***Equal Voice/Right of Control in the Direction of the Enterprise:***

"[T]hat both [parties] exercised some degree of control over various aspects of the job [is] indicative of the requisite control necessary to find a joint venture." *Firestone v. VanHolt*, 186 S.W.3d 319, 326 (Mo. App. W.D. 2005). "There must be some active participation in the enterprise, some control over the subject-matter thereof or property engaged therein." *Jeff-Cole Quarries, Inc.*, 454 S.W.2d at 15 (internal quotation marks omitted).

Here, the evidence showed that Toobaroo controlled its software, which was the gateway for clients of the joint venture to interface with WRI's fulfillment services. Toobaroo's software ran the most profitable and largest portion of the joint venture's business and changes Toobaroo made to the software changed procedures of WRI and the joint venture. Breht collaborated on the decision regarding a major purchase of a printer for WRI that was used in the joint venture. WRI employees performed the back-end functions of the Lit Store aside from one that Breht kept control of due to the high value of the coupons and his greater access to adequate internet speed for their creation. Getting the Vectra Rebate program up and running was a coordinated joint effort in which Toobaroo and WRI both played a major role. Breht and Cindy testified that Breht generated

15

the joint venture's billing to BI and CEVA.  Vectra Rebate orders could not be printed until Breht processed them.  Breht composed a letter convincing CEVA to use WRI rather than another option, and WRI only added an introductory paragraph and used its letterhead.  Breht reached a fulfillment agreement with CEVA, which WRI signed without comment or changes.  Testimony from Breht as well as emails among Breht, Cindy, Brian, Peter, and Connie reflected the collaborative nature of their participation in the joint venture's business, including information sharing, participation in meetings and other efforts to sell more business to their clients, and designing a new fulfillment building and integrating it in the ongoing business of the joint venture.

Viewing the evidence in the light most favorable to the jury's verdict, affording the plaintiff all reasonable inferences and disregarding all contrary evidence and inferences, *Inv'rs Title Co.*, 217 S.W.3d at 296, Toobaroo made a submissible case establishing the existence of a joint venture with "legal and substantial evidence support[ing] each fact essential to liability."  *Sanders*, 364 S.W.3d at 208.

Point I is denied.

*Damages:*

Our careful review of WRI's claim that Toobaroo's breach of joint venture damages were not supported by substantial evidence reveals it to be similarly without merit.

Evidence regarding the damages arising from WRI's breach of the joint venture agreement with Toobaroo included Breht's testimony as to compensation differences he found out about, emails addressing his concerns, documents showing compensation of each of the brothers and Cindy, documents showing WRI's financial information including changes in revenue, cash flow, and profits, and testimony and a demonstrative exhibit from Toobaroo's expert witness, economist Dr. Kurt Krueger.

16

WRI first argues that because Dr. Krueger calculated "Breht's" damages and not Toobaroo's damages, Toobaroo presented *no* evidence of damages. Substantial evidence showed, however, that Breht conducted his business with the joint venture through his wholly-owned corporate entity, Toobaroo. Toobaroo invoiced WRI for the amounts agreed to under the joint venture, and WRI paid Toobaroo accordingly, and all damages resulting from WRI's breach were to Toobaroo. When Dr. Krueger referenced "Breht's" damages, the jury understood that it was in the context of his wholly-owned company's damages. Moreover, there is a distinction between whether expert opinion testimony is *admissible* and whether a plaintiff's case is *submissible* in reliance on that testimony, and once that testimony "has been admitted," as Dr. Krueger's opinion testimony as to Toobaroo's damages was here, "it may be relied upon for purposes of determining the submissibility of the case." *Sanders*, 364 S.W.3d at 209. Furthermore, additional substantial evidence of damages came in through WRI's Exhibit 114A, a Comparison of Peter, Brian, and Toobaroo's (i.e., Breht's) Annual Compensation during the relevant time period, from which damages could be established with reasonable certainty.

Viewing the evidence in the light most favorable to the jury's verdict, affording the plaintiff all reasonable inferences and disregarding all contrary evidence and inferences, *Inv'rs Title Co.*, 217 S.W.3d at 296, Toobaroo made a submissible case establishing damages from WRI's breach of their joint venture agreement with "legal and substantial evidence." *Sanders*, 364 S.W.3d at 208.

Point II is denied.

**Points III and IV**

In its third and fourth points on appeal, WRI contends that the trial court erred in denying its motion for new trial because (III) the jury instruction did not require Toobaroo to prove the

17

existence of a joint venture by clear and convincing evidence, and (IV) Dr. Krueger's testimony was improperly admitted because it was based on legally improper damage calculations and not legally relevant.

Review of the trial court's denial of a motion for new trial is for an abuse of discretion. *St. Louis Cty. v. River Bend Estates Homeowners' Ass'n*, 408 S.W.3d 116, 134 (Mo. banc 2013). Such denial constitutes an abuse of discretion where the "ruling is clearly against the logic of the circumstances then before it and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.* (quoting *In re H.L.L.*, 179 S.W.3d 894, 896-97 (Mo. banc 2005)). We view the evidence in the light most favorable to the trial court's ruling. *Id.*

***Jury Instruction:***

WRI's contention that the appropriate burden of proof for the existence of a joint venture is clear and convincing evidence is incorrect. Admittedly, however, WRI's confusion on this topic is, in part, created by Missouri's intermediate appellate courts repeatedly failing to adhere to the requirement that "we are constitutionally bound to follow the most recent controlling decisions of the Missouri Supreme Court[.]" *John Doe B.P. v. Catholic Diocese of Kansas City-St. Joseph*, 432 S.W.3d 213, 219 (Mo. App. W.D. 2014).

Though federal precedent from the United States District Court, Eastern District of Missouri, is not binding upon this Court, we find former Missouri Supreme Court Judge and current United States District Court Judge Stephen N. Limbaugh, Jr.'s commentary on this topic to be compelling:

> To be sure, Missouri law on the issue [burden of proof to prove existence of joint venture] is confusing. Most recent cases—all from the Missouri Court of Appeals—apply the clear and convincing standard. *See, e.g.*, *Clark v. Francis*, 422 S.W.3d 369, 378 (Mo. App. W.D. 2013); *Winslow v. Nolan*, 319 S.W.3d 497, 501 (Mo. App. E.D. 2010); *Price v. Vattes*, 161 S.W.3d 397, 400 (Mo. App. S.D. 2005); *H2O'C v. Brazos*, 114 S.W.3d 397, 402 (Mo. App. W.D. 2003); *Nesler v. Reed*,

703 S.W.2d 520, 523 (Mo. App. E.D. 1985). . . . A few cases also confoundingly state that the agreement must be "proved by cogent, clear and convincing evidence, or at least by a preponderance of the credible evidence." *See, e.g.*, *Morrison v. Labor & Indus. Relations Comm'n*, 23 S.W.3d 902, 909 (Mo. App. W.D. 2000); *Shea v. Helling*, 826 S.W.2d 419, 421 (Mo. App. E.D. 1992); *Brotherton v. Kissinger*, 550 S.W.2d 904, 907 (Mo. App. S.D. 1977). The last pronouncement of the Supreme Court of Missouri, however, in *Grissum* [*v. Reesman*], 505 S.W.2d 81 [(Mo. 1974)], noted that ***the burden is a preponderance of the evidence unless the joint venture at issue involves "an oral contract to convey real estate or the establishment of a resulting trust in real property," in which case the higher clear and convincing burden applies.*** *Id.* at 85-86. The case relied on for this distinction, *Brooks v. Brooks*, 208 S.W.2d 279 (Mo. 1948), in turn relied on 48 C.J.S., Joint Adventures, § 12, for the general rule that "[a] preponderance of the evidence is necessary and sufficient to prove a joint adventure." *Id.* at 284. ***The clear and convincing standard, then, is simply the exception to the general rule for those two particular categories of cases. Holdings [by the Missouri Court of Appeals] to the contrary in the post-Grissum cases simply overlook the distinction. Accordingly, the standard here is preponderance of the evidence.***

*Morley v. Square, Inc.*, No. 4:10CV2243 SNLJ, 2016 WL 1615676, at *7 (E.D. Mo. Apr. 22, 2016) (emphasis added).[8]

Similarly, here, because no real estate conveyances were part of the joint venture agreement in question, the burden of proof standard is preponderance of the evidence.[9] Jury Instruction No. 4, given here, instructed accordingly, directing in relevant part, that "[t]he party who relies upon any disputed fact has the burden to cause you to believe that such fact is more likely true than not true." *See State Bd. of Nursing v. Berry*, 32 S.W.3d 638, 642 (Mo. App. W.D. 2000) (explaining that "[p]reponderance of the evidence is defined as that degree of evidence that is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows the fact to be proved to be more probable than not." (internal quotation marks

---

[8] It should go without saying that opinions from the Missouri Court of Appeals failing to follow the most recent controlling precedent from the Missouri Supreme Court, as outlined by Judge Limbaugh in *Morley v. Square, Inc.*, as well as *Norber v. Marcotte*, 134 S.W.3d 651, 658 (Mo. App. E.D. 2004), and *Hillme v. Chastain*, 75 S.W.3d 315, 317 (Mo. App. S.D. 2002), should no longer be followed as to the issue of the burden of proof necessary to establish the existence of a joint venture.

[9] This opinion has been reviewed and approved by order of the court *en banc*, as required by Missouri Court of Appeals Western District Special Rules, Rule 31 (2020), and in accordance with Supreme Court Operating Rule 22.01.

omitted)).  As such, the trial court's denial of WRI's motion for new trial based on the use of Instruction No. 4 on the burden of proof for joint venture was not an abuse of discretion.

Point III is denied.

***Admission of Expert Witness Testimony:***

WRI's final contention is that the trial court erred in denying its motion for new trial because Dr. Krueger's testimony was improperly admitted.  WRI asserts that Dr. Krueger's testimony was based on legally improper damage calculations and not legally relevant.  WRI incorporates by reference the same arguments raised in its second point as to why Toobaroo failed to make a submissible case for damages—arguments that we have already rejected in our discussion of Point II.

The damages Dr. Krueger testified to "on March 31, 2014 and Later" (Ex. 416A) represented his present valuation of Toobaroo's interest in the joint venture as of March 31, 2014, consisting of a discounted calculation of net annual damages for a five-year period and seven-year period.  The valuation was based on profits generated by the joint venture in 2014.  Although the figures were based on estimates, the estimates were based on historical fact and were not mere speculation.  *Schreibman v. Zanetti*, 909 S.W.2d 692, 699 (Mo. App. W.D. 1995).  The trial court properly allowed the jury to assess the weight to be accorded to Dr. Krueger's opinion testimony. *Id.*

When the evidence on the record before us is viewed in the light most favorable to the trial court's ruling, Dr. Krueger's testimony was admissible and each of the challenges thereto posed by WRI on appeal go to the weight of the opinions reflected in that testimony, which the trial court properly allowed the jury to determine.  As such, the trial court's denial of WRI's motion for new

20

trial was based on findings substantially supported by the record and was not an abuse of discretion. *River Bend Estates Homeowners' Ass'n*, 408 S.W.3d at 134.

Point IV is denied.

## Conclusion

The judgment of the trial court is affirmed.


/s/ *Mark D. Pfeiffer*
Mark D. Pfeiffer, Judge

Thomas H. Newton, Presiding Judge, and Edward R. Ardini, Jr., Judge, concur.